[Civ. No. 7457. First Appellate District, Division One.—November 24, 1931.]

OLOF MONSON et al., Respondents, v. MARTHA W. FISCHER, Appellant.

504.

506

Percy E. Towne, Richard tum Suden and Peter A. Breen for Appellant.

Leicester & Leicester and Norman A. Eisner for Respondents.

THE COURT.—Respondents, herein called the contractors, recovered judgment against appellant in the sum of $45,544.69 as damages for the alleged breach of a contract for the construction of a four-story concrete building. It was alleged that the contractors were prevented from com-

pleting the structure, and the judgment included the value of its partial construction with interest thereon, and the estimated loss of profits. Reversal is sought on the ground that the judgment and findings are unsupported.

The contract price was $124,175. The structure was designed to carry two additional stories and had been leased in advance for factory purposes. The contract required the contractors to furnish the materials and perform the work in accordance with certain plans and specifications which were prepared by appellant's architect. The contract consisted of two documents, one entitled "Articles of Agreement", which was a printed form containing certain typewritten stipulations; the other, designated as the "Specifications", was entirely typewritten, was annexed to the articles of agreement, and by reference made a part thereof.

The specifications with respect to the concrete, so far as the same are material, provided as follows: "The concrete for plain work shall be composed of one part of cement to three parts of sand and five parts of gravel and crushed rock, mixed. Re-inforced concrete shall be composed of one part cement to six parts of sand and crushed rock or gravel, except for all interior and/or free standing columns, where the mix will be a one to four and one-half $(1:4\frac{1}{2})$ as noted on the structural plans. . . . The ultimate strength of 1 to 6 concrete shall not be less than 2,000 lbs per square inch, and the 1 to $4\frac{1}{2}$ concrete not less than 2500 lbs per square inch. The owner reserves the right to have samples taken. . . . "

The articles of agreement provided that the work should be done and the materials furnished under the direction and supervision of the architect or the superintendent selected by the owner; that the same should be paid for in monthly installments of seventy-five per cent of the value of the completed work done during the previous month as estimated by the architect; that when each installment became due a certificate should be obtained from the architect stating the same to be due and the amount thereof; that progress payments by the owner should not be construed as an absolute acceptance of the work done up to the time of such payments except as to such matters as were open and obvious, but that the architect or superintendent should exercise reasonable diligence to discover and report to the contractors unsatisfactory materials and workmanship so as to avoid un-

necessary trouble and cost to the contractors in making good the defects; otherwise any objection thereto should be deemed waived; and that if the owner should fail to make within seven days of its maturity and presentment any payment provided in the contract, then after three days' notice the contractors might terminate the contract and recover for any work done, any loss on plant, material or workmanship and the reasonable anticipated profit on the uncompleted portion of the work.

The specifications further stipulated that "the architect or his representative, as agent of the owner, shall have general supervision and direction of the work. He has authority to stop work whenever necessary to ensure proper execution of the contract, and is authorized and empowered to reject or refuse all labor and materials, or methods of application, or any part thereof, that do not comply in kind, quality and quantity with the drawings and specifications.

"To prevent all disputes and litigation the architect shall in all cases determine the amount and the quality of the several kinds of work which are to be paid for under this contract, and he shall determine all questions in relation to said work and the construction thereof, and he shall in all cases decide every question which may arise relative to the execution of this contract on the part of the contractor, and his estimate and decision shall be final and conclusive"; also that "any and all work or material that does not conform to the plans and specifications shall be immediately removed from the premises or made good by the contractor when directed to do so by the architect . . . "; and that "neither the final certificate nor payment shall relieve the contractor from responsibility for omissions and faulty materials or workmanship, and he shall remedy any defects therein or make good any omissions, and pay for any damage to the other work resulting therefrom which shall appear within a period of one year from the completion and. acceptance of the work".

Certain of the printed portions of the articles of agreement were as follows: "Should dispute arise as to the true meaning of the plans and specifications, or respecting the manner or sufficiency of the performance of any work thereunder . . . the questions in dispute shall in the first instance be decided by the architect; but should either owner or con-

tractor be dissatisfied with his decision the question shall, on written demand of either delivered to the other at his last-known residence or place of business, be submitted for decision to a board of arbitration, consisting of three disinterested men experienced in the business of building, one to be named in the demand of the party making the demand, one by the other party within five days thereafter, the third by these two, these arbitrators to have plenary power, and the decision of any two of them to be conclusive and binding upon both parties to this agreement. No dispute shall interfere with the progress of the general construction, but necessary work shall proceed under the direction of the architect, and the decision of the arbitrators shall award adequate compensation therefor as due.'' Further, that '' . . . No portions of the specifications that are in conflict with this agreement, or that are not actually descriptive of the work to be done hereunder or the manner in which it is to be done, are to be considered as part hereof, but such portions, if any, are null and void.''

Excavations preliminary to the erection of the building were completed before the execution of the contract on November 7, 1927. The pouring of the concrete commenced on that date, and work on the structure continued until December 2, 1927.

As stated, appellant had leased the structure. By the lease the tenant assumed responsibility for its maintenance during the term, and agreed that its occupancy should be deemed an admission that it was sound and constructed in compliance with the above plans and specifications, which were made a part of the lease. Because of this provision the tenant consulted the engineering firm of Smith, Emery & Co. regarding the best method of securing information as to the materials and workmanship used in the construction of the building, and persons employed by Smith, Emery & Co. were present on each day that the mixing and pouring of concrete continued and took samples thereof.

The work progressed to a point where the footings and basement columns upon which the building was to rest were poured. These footings consisted of solid rectangular masses of concrete approximately eight feet square and three feet in height. The basement walls were also poured up to the same level around the entire excavation except at the point

where the concrete mixer was operating. It also appears that several of the sidewalk slabs were constructed.

Under the contract the contractors, upon obtaining the architect's certificate, would be entitled on December 1, 1927, to a progress payment for work done previous to that date; and on December 5, 1927, the architect delivered to them his certificate stating that there was due the sum of $21,504.75. On the same date a duplicate of the certificate was delivered to the appellant, but the installment was not paid. On December 2, 1927, the architect notified the contractors in writing that he had received a report from Smith, Emery & Co. covering two 14-day tests of the concrete, which indicated a crushing strength of 685 and 809 pounds per square inch, and that the test of the "1 to 6" mix should show at least a strength of 1100 pounds per square inch at the end of seven days. By the same notice the contractors were instructed "not to proceed further with the concrete work that we may determine what is at fault with the materials". On December 5, 1927, the contractors were further notified by the architect "to remove the present concrete material from the premises and submit new samples of the material for the work to Smith, Emery & Co. for analysis and approval before proceeding further with the work"; also "to remove all the concrete in the first floor slabs and beams that was placed this morning contrary to written instructions". On December 6, 1927, the architect wrote to the contractors stating as follows: "You are required to remove forthwith the concrete columns heretofore installed by you on the job down to the footing levels, and this at your own expense. This will require that the sidewalk construction must either be removed to the center line of the span, or a special beam constructed at the building line to support the end of the present sidewalk slab, a detail of which will be furnished you. This demand is made upon the ground that the concrete work as now installed and the whole thereof is defective as to materials, mix and workmanship, and does not comply in any particular nor in any degree with the specifications forming part of the contract. . . . " To this the contractors replied by letter dated December 9, 1927, denying the above statements, and contending that the concrete was mixed and placed in accordance with instructions given them from Smith, Emery & Co.; further, that the architect had failed to report any

defect in the materials or workmanship during the progress of the work, and that the same had been approved as it progressed by Smith, Emery & Co.

After the last-mentioned date several meetings were had between the parties and their representatives, at which, according to the contractors, they informally offered to submit the matters in dispute to the decision of engineers, two to be appointed by the parties, and the third to be selected by the two appointees, but their offer was refused.

The architect on December 24, 1927, by letter addressed to appellant, stated that the contractors had failed to perform the work or furnish materials in accordance with the contract and the specifications; further, that the contractors were notified on December 6, 1927, to remove the defective work and materials but had neglected for more than ten days to proceed pursuant to the plans and specifications; also that such neglect was sufficient ground for the termination of the contract after notice as provided therein and the subsequent failure by the contractors to proceed within the time limited thereby.

Further correspondence passed, the contractors contending that there were no defects in the work, and offering to proceed, and appellant demanding that they remove the concrete claimed to be defective and replace the same according to the specifications.

On January 14, 1928, appellant gave notice to the contractors that she was still willing that they proceed with the work in accordance with the plans and specifications, but demanded that the concrete objected to by the architect be removed; that they had discontinued and abandoned the work for more than ten days, and if they failed to proceed within five days she would terminate their employment and herself finish the work by whatever method she deemed expedient; further, that the notice was given pursuant to the terms of the contract.

Following this the contractors formally offered to submit the dispute to arbitration, and nominated one of the arbitrators. Appellant refused to arbitrate; and after notice of the hearing the arbitrator appointed by the contractors entered and served his decision, in which he found the quality of the concrete to be in accordance with the

specifications, and that the same would develop the ultimate strength as therein provided.

The court found, contrary to the allegations of appellant's answer, "that it was not true that the work done and the materials furnished by plaintiffs (the contractors) were not in accordance with the plans and specifications . . . ; nor was it true that the concrete placed by the plaintiffs in the structure did not have the strength required by the specifications". It also found that the concrete was mixed, poured and made in accordance with the contract and specifications, and was of the required quality and strength.

Appellant's contention that the above findings are not supported and that the same do not support the judgment is based upon the typewritten provision in the specifications that the architect "shall in all cases decide every question which may arise relative to the execution of this contract, and his estimate and decision shall be final and conclusive"; and it is urged that the trial court, having found that such a question did arise which the architect decided adversely to the contractors, his decision was final and conclusive and not subject to re-examination by the trial court, and that consequently these findings are not supported by competent evidence.

The rule appears to be well settled that the decision, estimate or certificate of an architect in approving or disapproving the work as a performance of the contract, or in passing upon questions relating thereto, is, in the absence of fraud, bad faith or mistake, conclusive and binding on the parties where the contract either expressly or impliedly shows that it was the intention that the person to whom the question is submitted should be the final arbiter thereof. (*Brown* v. *Aguilar,* 202 Cal. 143 [259 Pac. 735].) Here there was no allegation by the contractors or any finding of fraud, mistake or bad faith on the part of the architect in deciding that the work was not in accordance with the specifications. But the contractors, nevertheless, claim, in view of the printed provision in the articles of agreement, that the portions of the specifications in conflict therewith, or not actually descriptive of the work to be done, should be void, that the stipulation in the latter document that the architect should

in all cases determine the quality of the work and all questions in relation thereto and the construction thereof, and making his decision final and conclusive, conflicts with the further provision in the articles of agreement that should a dispute arise respecting the manner or sufficiency of any work, the same should first be decided by the architect, but in case of dissatisfaction by either party the question should then be submitted to arbitration, and that the latter controls.

Appellant concedes that under the contract the contractors were given the right to have the correctness of the architect's decision determined by arbitration; but it is claimed that his decision in the first instance was final and conclusive, and that it was therefore incumbent upon the contractors to remove the work to which he objected and proceed according to his directions; that having removed the work they might then upon timely demand have had the question determined by arbitration, and any damage caused by an erroneous decision of the architect would have been chargeable to appellant.

Section 1651 of the Civil Code provides that where a contract is partly written and partly printed, or where part of it is written or printed under the special direction of the parties and with a special view to their intention, and the remainder is copied from a form originally prepared without special reference to the particular parties and the particular contract in question, the written parts control the printed parts, and the parts which are purely original control those which are copied from a form.

It is clear from the evidence that the specifications were written under the special direction of the parties and with a special view to their intention, while the printed articles of agreement to which the specifications were annexed were prepared without special reference either to the parties or their contract. We must therefore hold that the section applies in the present case, and that it was the intention that the typewritten provisions mentioned should control.

Contracts should be construed, if possible, so as to give force and effect to every part (Civ. Code, sec. 1641; Code Civ. Proc., sec. 1858); and we are satisfied that appellant's position as stated above is correct. Therefore,

no fraud or mistake on the part of the architect having been alleged or found, it was the duty of the contractors to remove the work claimed to be defective, and then call for an arbitration of the dispute.

But notwithstanding the controlling force of the specifications in cases of conflict, the contractors urge that effect should be given to another clause of the articles of agreement not in conflict therewith, namely, the provision that as the work progressed the architect should exercise reasonable diligence to discover and report to the contractors any material or workmanship not satisfactory, and that otherwise any objection thereto should be deemed waived.

In this connection the court found, contrary to the allegations of appellant's answer, that it was not true that on December 5, 1927, nor immediately after the issuance of the certificate which the architect issued on that day, he for the first time ascertained that plaintiff had been using in the composition of the concrete work improper and defective materials, or materials which were not in accordance with the specifications, or that he also ascertained that the concrete work would not comply with the requirements of the contract or specifications under the usual crushing tests; further, that before any concrete work was done the tenants notified the contractors that they desired to inspect and test the work as it progressed, and for that purpose had employed Smith, Emery & Co.; that appellant, after learning of this arrangement, did not herself employ an inspector, but notified the contractors that there would be an inspector on the work, and that they would be required to do the concrete work under such inspection. The articles stipulated that the contractors should have general control of the work, but the owner or her employees or representatives, and the architect or superintendent and his representatives, should have access thereto at all times. It was also found that some concrete was poured on November 7, 1927, but that from and including November 8, 1927, a representative of Smith, Emery & Co. was present during the performance of all the concrete work, and that except as above stated none was poured during his absence; that the architect at all times recognized said firm as the testing engineers of the work, and in addition to his own supervision relied on them

for samples and reports of their inspection and tests, and that the contractors at all times followed the directions and instructions of the firm's inspector; that prior to the mixing and pouring of the concrete the contractors submitted samples of the materials used, and at no time during the progress of the work did appellant or her architect or the inspector report to the contractors any objection to the materials or the work done; that all materials used were as required by the plans and specifications; also "that the defects, if any, which existed in the materials or workmanship used or furnished by the contractors in and about the concrete work were open and obvious during the progress of the work, and that it was not true, as alleged by defendant (appellant) that her objections were made as soon as such defects were ascertained by her or by any person employed by or representing her''; and that "it is true that on and before November 29, 1927, and at all times from and after the commencement of the concrete work done by plaintiffs (the contractors), appellant and her architect had knowledge and notice of the kind and quality of the material which plaintiffs were using and did use in all of said concrete. . . . '' It was further found, however, "that the ultimate strength and quality of said concrete or any part thereof could not be accurately estimated until twenty-eight days had elapsed after the pouring thereof, but the strength and quality of said concrete could have been approximately estimated at the expiration of seven days after the pouring thereof. . . . ''

· It is clear that neither the firm of Smith, Emery & Co. nor its employees were empowered to approve the completed work, or to bind the parties on the question whether it complied with the requirements of the contract, these being matters for the architect's determination; and while the superintendent and foreman of the contractors testified that representatives of the engineering firm were present while the work was in progress, and made objections from time to time to the manner in which the concrete was being mixed and to some of the materials used, and that the contractors agreed to meet these objections, nevertheless the record discloses no evidence of an agreement that the parties should be concluded by their suggestions or determination, or the powers of the architect thereby limited.

■ Section 109 of the San Francisco Building Law and Ordinance, regulating the construction of buildings therein, provided that a stress of 2,000 pounds per square inch at the age of twenty-eight days should be considered the ultimate compressive strength of concrete composed of one part cement to six parts of sand and gravel; and that 2,500 pounds per square inch at the age of twenty-eight days should be considered the ultimate compressive strength of concrete composed of one part cement to four and one-half parts of sand and gravel. The parties are presumed to have had the law in view in making their contract (*Brown* v. *Kling,* 101 Cal. 295 [35 Pac. 995]; *Maguire* v. *Reardon,* 41 Cal. App. 596 [183 Pac. 303]); and contractor Monson testified that it was his understanding that the strength of the concrete was to be determined by the twenty-eight day test. While the testimony shows, as the court found, that an approximate estimate of the strength and quality of the concrete could be made by testing after the expiration of seven days, there is nothing in the contract or the testimony which supports the contractors' contention that the architect, at the expiration of any period less than twenty-eight days was bound at his peril to determine the question; and it is our conclusion that the provision that he should exercise reasonable diligence to discover and report to the contractor as the work progressed, defects in materials and workmanship which were not satisfactory, should be construed in the light of the usual method of ascertaining with certainty the strength and quality of concrete, namely, the twenty-eight day test. Nor does the testimony of certain witnesses that they could determine with a fair degree of certainty by inspecting the materials, and observing the manner in which they were mixed, the strength and quality of the concrete they would produce, change the above conclusion; nor under the evidence does a reasonable construction of the contract support the inference that concrete wanting in the requisite strength—a fact which could be accurately determined only by the twenty-eight day test was an open and obvious defect within the meaning of the instrument.

■ The point is made by the contractors that the demand for the removal of the concrete was coupled with a further demand, which was contrary to the contract, namely,

that the removal be at their expense. As to this we think it sufficient to say that such a demand was not binding on the parties, it being the rule that the architect has no implied power to change the terms of the contract (*Brown* v. *Coffee,* 17 Cal. App. 381 [121 Pac. 309, 311]); nor was the contractors' refusal based upon this ground but upon the claim that the work which they were required to remove was not defective.

As stated, the architect on December 5, 1927, issued his certificate that the contractors were entitled to a progress payment of $21,504.75. On the following day appellant was notified by the architect to withhold payment, but the contractors were not advised of such notice. On December 29, 1927, a second certificate was issued to appellant, and a copy sent to the contractors, certifying that the latter had failed to perform in that the concrete work was defective as to materials and workmanship. The first certificate was presented to appellant on December 27, 1927, with a letter demanding payment, but the same remains unpaid. Appellant contends that the first certificate was issued by mistake; and that in any event the rule that the decision of the architect is conclusive does not apply to progress payment certificates; while the contractors insist that the rule applies equally in such cases; and further, that even though there was a neglect of the architect's duty to the owner, the certificate was not issued by mistake, and therefore could not be recalled.

On December 2, 1927, the architect wrote to appellant the letter hereinbefore referred to, but notwithstanding this the certificate was issued. In explanation of his action the architect testified that on November 29, 1927, he was advised by Smith, a member of the engineering firm, that the tests of the concrete "were not running very good"; and on December 5th, before the certificate was issued, at a conference between the witness, the contractors and Smith, the latter advised in substance that the concrete was of poor quality, and the gravel used in the mixture was poor material. The witness claimed that he had no definite reports at the time the certificate was issued, further stating "I never thought there would be anything serious outside of a few hundred pounds difference in strength, which often happens and that you can regulate right on the job. I never

expected anything so bad as the actual reports turned out to be; so, under the conditions I issued the certificate''; further, that the certificate was based on the written statement of the contractors as to the amounts expended. In this connection he said that he was satisfied from his inspection of the work that the statement was approximately correct; that in such cases he never went into close details until nearing the final payment, when he made sure that sufficient money was withheld to finish the job. Appellant alleged that immediately after the issuance of the certificate the architect for the first time ascertained that the contractors were using improper and defective materials, and that the concrete would not comply with the requirements of the contract. She also claims that the evidence shows that the contractors obtained the certificate by misrepresenting the cost of the excavation work. But no mistake other than the above was alleged, and the court found the allegations to be untrue.

■ It is evident that when the certificate was issued the architect believed the concrete did not conform to the standard fixed by the contract, but assumed that any defects might be satisfactorily corrected. This question has been held to be one for the jury (*Rialto Const. Co.* v. *Reed,* 17 Cal. App. 29 [118 Pac. 473]), and the court's finding that there was no mistake is fairly sustained by the evidence. It has also been held that where the contract calls for periodical estimates as the work progresses, and payments based thereon, and for a final estimate after the work is complete, the periodical estimates are not conclusive as a rule on either party; but where the contract expressly or by necessary implication so provides, such estimates, in the absence of fraud or mistake, are binding on the parties, both the owner and builder. (9 Cor. Jur., Building and Construction Contracts, secs. 165, 166, pp. 826–828; *Dingley* v. *Greene,* 54 Cal. 333.) ■ As urged by appellant, the articles of agreement provided that the making of progress estimates should not be considered as an absolute acceptance of the work done up to that time except as to such matters as were open and obvious, but, with that exception, the entire work should be subject to the inspection and approval of the architect. Nevertheless, as stated, the specifications also provided that the architect should determine all ques-

tions in relation to the work, and that his estimate and decision should be final and conclusive. The latter clause, as urged by appellant, bound the contractor; and it is also clear from its provisions that the same was also intended to bind the owner, and that the issuance of the certificate should, in the absence of fraud or mistake, be conclusive of the contractors' right to the progress payment, subject to the provision that such payment should not, except as to matters open and obvious, constitute a final acceptance of the work done up to that date.

Under this construction of the contract and in view of the findings the contractors became entitled to demand the payment mentioned in the certificate; and it has been held that the owner's obligation to pay such installment becomes fixed; and although the contract is entire and has not been fully performed an action therefor can be maintained. (9 Cor. Jur., Building and Construction Contracts, sec. 170, p. 832; *Milske* v. *Steiner Mantel Co.*, 103 Md. 235 [115 Am. St. Rep. 354, 5 L. R. A. (N. S.) 1105, 63 Atl. 471].)

In the case of building contracts it has long been the general rule in this state that the mere failure to pay an installment as it becomes due, unless such payment is under the contract a condition precedent, does not amount to prevention which will authorize a contractor to abandon the work and sue for all the benefits he would have received from full performance; but it nevertheless constitutes a breach which will justify a rescission and recovery for the work already done. (*Cox* v. *McLaughlin*, 52 Cal. 590; Id., 54 Cal. 605; *Porter* v. *Arrowhead Reservoir Co.*, 100 Cal. 500 [35 Pac. 146]; *Fairchild-Gilmore-Wilton Co.* v. *Southern Refining Co.*, 158 Cal. 264, 274 [110 Pac. 951].)

In this connection, however, the articles of agreement provided that if the owner failed to pay the contractor within seven days of its maturity and presentation any payment provided for therein then the contractor might upon three days' written notice terminate the contract and recover compensation for work done, profits and damages. Parties may provide in their contracts for notice and demand as conditions precedent to the obligation to perform; and where this is done compliance with the condition must be alleged and proved (13 Cor. Jur., Contracts, sec. 741, p. 660; *Danielson* v. *Neal*, 164 Cal. 748 [130 Pac.

716]), although the requirement that such condition be performed will be waived by a refusal to perform by the other party to the contract (Civ. Code, sec. 1440); but to have that effect the refusal must be unequivocal, and be treated and acted upon as such by the party to whom the promise was made. (6 Cal. Jur., Contracts, sec. 246, p. 413; 6 R. C. L., Contracts, sec. 385, p. 1025.) In the present case while the testimony shows that the architect notified appellant not to pay, there was no refusal on her part prior to the presentation of the certificate and demand of December 27, 1927; nor was any act by her or the architect treated as such by the contractors previous to that date. Consequently appellant was not in default under the contract by reason of the nonpayment of the amount called for by the certificate before the same was presented. In the meantime the architect, after receiving further information from Smith, Emery & Co., determined that the work done was not in accordance with the specifications, and demanded its removal. This under the contract he had the right to require, subject of course to the contractors' right to have the correctness of his decision subsequently determined by arbitration. The contractors, however, refused, it being their contention that they were entitled to have the question settled by arbitration before removing the work. In view of our construction of the contract the contractors' position was not tenable; and their refusal, if continued as provided by the contract, constituted a breach on their part, giving appellant the right upon notice to terminate the employment, take possession of the premises and finish the work. The contract provided that in the latter event the contractor should not be entitled to any further payment until the work was finished, when, if the unpaid balance of the contract price exceeded the expense of finishing the work, such excess should be paid to the contractors, or if the expense exceeded such balance the contractors should pay the difference to the owner.

When a contractor fails to complete his contract after partial performance the owner may require full performance as a condition to any recovery thereon, or payment for the work and material furnished thereunder; or, where the contract so provides, he may complete the work at the cost of the contractor; and where the right of

completion is given by the contract after notice the completion of the work by the owner after such notice must be deemed a completion of the work under the contract (*Dahlberg* v. *Girsch,* 157 Cal. 324 [107 Pac. 616]); and in such case the contractor is entitled to receive only the balance of the contract price that may remain over and above the cost of completion. (6 Cal. Jur., Contracts, sec. 256, p. 429; *Hughes Brothers* v. *Hoover,* 3 Cal. App. 145 [84 Pac. 681]; *O'Brien* v. *Garibaldi,* 15 Cal. App. 518 [115 Pac. 249].) The final notice by appellant stated that it was given pursuant to the terms of the contract; and although the record shows no express allegation or finding as to the fact we assume that the appellant proceeded thereunder to complete the work. As to when the same was completed the record is silent, but from certain testimony by the architect as to the cost thereof the fact is sufficiently shown. It also appears from the testimony that the appellant availed herself of certain of the work done by the contractors previous to the notice. Appellant also alleged in a cross-complaint that she was obliged to remove a portion of this work, and, due to the expense of such removal and the delay, suffered damage in the sum of $20,000. The court found that she was not obliged to remove the work, and suffered no damage by reason of anything done or omitted by the contractor; but no findings as to the cost or date of the completion or the value of the work done by the contractors which appellant used were made; nor, in view of the court's conclusion, would such findings be necessary to its decision.

We are of the opinion that under the contract and the evidence the contractors would have been entitled to recover the progress payment according to the certificate; but that such recovery or payment of the amount would not have constituted an absolute acceptance by appellant of the work done up to that time. They having, however, breached the contract by failing to remove the work objected to by the architect, and having persisted in such refusal, appellant was entitled after notice, which was given, to take possession and finish the work. This step having been taken the contractors, as was expressly stipulated, were not entitled to receive any payment before the work

was finished, and then only subject to the further rights of appellant under the contract.

It would seem from the record that the building had not been completed when the complaint was filed. It was of course plaintiffs' theory that full performance by them was prevented, and on this assumption their action was properly commenced; but under our view of the case nothing would become payable until the completion of the building, and an action before that time would be premature. (1 Cal. Jur., Actions, sec. 54, p. 377.)

For the foregoing reasons the judgment is reversed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 24, 1931, and an application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 22, 1932.