[Civ. No. 14867. First Dist., Div. Two. Dec. 1, 1952.]

EARL W. HEPLE, Respondent, v. THERESA A. KLUGE et al., Appellants.

Herbert Chamberlin for Appellants.

James F. Boccardo, Jean M. Blum and Edward J. Niland for Respondent.

GOODELL, J.—Plaintiff, a building contractor, sued for $19,354.38 for money advanced and services rendered at defendants' special instance and request, in the construction of a building in San Jose. Defendants pleaded that plaintiff had contracted to construct a building for $22,490 according to certain plans and specifications but had failed to do so. They also filed a cross-complaint for $30,000, of which $5,000 was claimed as damages for the demolition of the alleged unsuitable structure and $25,000 for other accrued and prospective damages. A verdict for $18,669.47 was returned in plaintiff's favor and against defendants on their cross-complaint. From the judgment entered thereon this appeal was taken after a new trial had been denied.

At the trial 17 witnesses were examined, and their testimony covers 730 pages.

The jury was instructed that the evidence was "uncontradicted that the plaintiff . . . expended . . . $19,869.47 for labor, materials, equipment rental and contracting services."

It was also instructed on the rule of substantial performance. The fact that the verdict was for a sum $1,200 less than the $19,869.47 figure would indicate that they followed the substantial performance instruction and deducted the $1,200 for deviations or variances.

Defendants, who are sisters, conducted a curtain laundry in leased premises in San Jose and decided to put up a building on a lot of their own on West San Carlos Street a short distance from their old location. Their purpose was to occupy half the ground floor for their business and rent the other half to tenants until such time as their business warranted their occupancy of the whole floor. The upper floor was to be apartments.

Plaintiff did not enter the picture until a year or so after defendants had started on their project.

Defendants first employed Kress and Gibson, San Jose architects, to design the building, but determined that its cost, according to the plans and specifications, was more than they could afford. They then employed Leonard Clover, an architectural draftsman, to prepare other plans. As he was not then licensed, he engaged Mark Thomas, a licensed engineer, to do the engineering part of the work. New plans were drawn by Clover and delivered to defendants by him, and in September, 1946, he and Thomas were paid in full for their services. Many months later defendants submitted these plans to plaintiff for bidding, and on June 26, 1947 he made defendants an offer reading as follows: "We propose to bid the sum of $22,490.00 for constructing your building . . . as per plans and specifications with the following items eliminations and substitutions [detailing items not involved herein] . . . The price quoted, $22,490.00 is a guaranteed cost. We are, however, willing to perform the work above specified on the guaranteed cost with the alternative of a cost plus setup. (Cost plus 5% overhead and 10% profit.) That is, if the cost plus is not in excess to [sic] our bid price, the owners shall accept the cost plus price." This was orally accepted by defendants on September 10, 1947.

On April 6, 1948, construction work on the building then about 80 per cent complete, was brought to a halt when defendants wrote plaintiff as follows: "In regard to your contract . . . please be advised that efforts are being made to arrive at a prompt determination of the responsibility for variances which have occurred in the construction as related to the original plans and specifications. We plan very shortly

to arrive at some proposal to submit to you after consulting with the various parties who have worked over the plans and with the Building Inspector. In the meantime, please do not continue your building operations.''

By that time upward of 20 controversies had arisen, the major one of which concerned the partition dividing the lower floor. Defendants wanted a partition which could be removed whenever the time arrived for them to make over the lower floor for their sole occupancy. However, a bearing wall was built instead of a temporary partition. Since this is the basis for the principal legal questions in this case, the evidence on that subject has to be set forth rather fully.

The evidence is without contradiction that when Clover assumed the job of making the plans, defendants discussed fully with him their reasons for requiring a temporary and removable partition. Thomas, who did the engineering work on the plans, was employed by Clover, not by defendants, and there is no evidence in the record that Clover or anybody else ever explained to him or to any of his associates or employees that the partition had to be removable, or gave him defendants' reasons for wanting it so. Furthermore, there is no evidence in the record that defendants ever told plaintiff anything about the removable partition or their reasons for it, or that Clover or anybody else did so.

Clover's original plans provided for an I-beam running lengthwise of the building, designed to support its upstairs part, which I-beam would, at the same time, permit of a partition beneath it and aligned with it.

Clover's contract with defendants was that he would produce plans which would meet all the requirements of the building laws. And while he was preparing the plans Clover told defendants that he was checking with the building inspector so that no changes would be necessary when a building permit was applied for, and that defendants would get workable plans which would pass the building inspector. Defendants testified that when they received the plans they understood they were getting such plans, and that that was what they paid Clover to produce. *They said they understood that if the plans did not pass, Clover would make whatever revisions were necessary to comply with his agreement.*

Plaintiff submitted the plans for approval shortly after his contract was made, but a building permit was refused.

Robert Lotz, Superintendent of the Department of Building of the City of San Jose, a witness for the defendants,

testified that he denied the permit "Because the structure, as shown on the plans, wouldn't comply with the city or state regulations. Q. In what particular, as to the lateral bracing? A. Principally the lateral bracing; there were some other things, also. Q. What were the other things, if you recall? A. *One was that beam that has been discussed so much;* I checked that since you were in my office a couple of weeks ago, and *that beam, as shown on the original plans, was too light to carry the required load.* Q. You didn't order the beam out, though, did you? A. No, sir, *I may have ordered it changed to a heavier beam* . . . Q. You did not so order; in other words, principally your orders were to take care of the lateral bracing forces under the Riley Act, is that correct? A. That, *and the vertical loads,* we checked for . . . all things in connection with the fireproofing, exits, I mean a total check on the place. Q. I see, but *the principal reason for denying the permit was that there was an over-stress on the beam, the I-beam, and in addition there were insufficient lateral bracings in the building,* is that correct? A. *That's correct."* (Emphasis added.)

Defendants were informed by an employee of plaintiff that the permit had been refused because "something had to be done about . . . bracing the concrete wall" and the plans had to go back to the engineer. Theresa Kluge was told by Clover that "it was something to do with the bracing of the concrete wall, something about lateral forces, and something about a Riley Act that had been passed while Mr. Thomas was in the service" and that it was "merely some work that Mr. Thomas had to do" and had "nothing to do with his [Clover's] work at all." Both defendants testified that they did not expect revised plans to be drawn.

The witness Pardini, plaintiff's assistant, testified that he informed defendants that the permit had been denied and that the plans had to go back to Thomas so that something could be done about the lateral bracing of the concrete wall.

After some delay Theresa Kluge called Pardini to ask if the changes had been made, and he told her to inquire of Clover if the plans were ready. Clover then referred her to Thomas, who told her the plans had been sent back to Clover's office and would be returned to him and then submitted to the building inspector. Defendants testified that no set of revised plans were delivered to them by Clover and that they did not know of, or consent to, the elimination of the I-beam, but thought the changes concerned only lateral bracing.

Savio, the engineer associated with Thomas, who did the work on which the revised plans were based, testified that Thomas took the plans to the building inspector and then reported to Savio what had been said. Savio made the changes to increase the lateral forces and improve the structural design and was told by Thomas to inform Clover of them. Savio eliminated the I-beam because he thought it would improve the design to provide for a bearing wall and because the I-beam, in his opinion, had no use in the plan. He went over the changes with Clover, who redrew the plans in accordance with Savio's sketches and returned them to Savio for further checking before they were used.

Clover testified that to comply with his contract with defendants it was necessary for him to deliver them a set of plans which would be passed by the building inspector; that he had employed Thomas to do the engineering work on the plans for the benefit of defendants; that when they failed to pass inspection defendants were entitled to look to him (Clover) for a set of plans that would be approved even though it was Thomas' part of the work that was involved, and not his, and that defendants would not owe him any more money for whatever additional work became necessary to secure the building inspector's approval. He also testified that he had told defendants they could find out the nature of the changes by calling Thomas; that they could pick up the plans at his office when they were completed and could destroy or disregard the old set when they got the new one. After construction was under way Clover had many discussions with defendants and, as he put it, was "beseiged" by them respecting practically every phase and stage of the construction. During these discussions he used the original tracings of the revised plans which he kept in his office. He never saw a set of the revised plans in defendants' possession.

Plaintiff testified that Clover's first set of plans did not show the I-beam in the manner in which a temporary or removable partition would be shown, since it showed "a full partition with electric wiring, and everything else, in it." The plumbing subcontractor, Serpa, a man with long experience as a plumbing contractor, testified that in the original Clover plans (on which he had made his bid) the I-beam did not indicate a temporary partition, but a permanent one, and that he in fact had planned to run the plumbing lines inside that middle wall.

Theresa Kluge testified that she first received a copy of the revised plans in March, 1948, which she said was the first time she knew that the elimination of the I-beam meant that the partition would be a permanent one. She testified that she was then told by plaintiff's employees that the building inspector had ordered the I-beam out. Her sister testified likewise. Plaintiff's foreman, Limegrover, testified that the new plans were shown to defendants on the job but that the changes were not discussed in detail with them. Pardini said that he delivered a copy of the revised plans to Theresa Kluge a day or so after the issuance of the permit, which would be in the early part of October, 1947, and another set in March, 1948.

The original Clover plans adopted the specifications drawn by Kress and Gibson, which contained the following provision:

"It is understood that the owner shall have the right *during the progress of construction* to make any alterations, additions, or omissions that he may desire, *to work or material herein specified or shown on drawings.* The same shall be carried into effect by the contractor without in any way violating or vitiating the contract, but if such changes are made the value of same must be agreed upon in writing between owner and contractor. No omissions will be allowed or extra work paid for unless ordered in writing by the owner." (Emphasis added.)

Appellants have not made it clear how or why this provision bears on the issues in this case since the changes in the plans were not such changes as were contemplated by such a provision. It was designed to protect the owner, to whom it gave the right to a change of mind "during the progress of construction." The elimination of the I-beam was not accomplished during the progress of construction since respondent could not commence to perform his contract "as per plans and specifications" (which was his obligation) until the building permit issued, and it was not issued until after the I-beam had been eliminated.

Appellants rely on such cases as *Brown* v. *Coffee*, 17 Cal. App. 381 [121 P. 309, 311], *Albert Steinfeld & Co.* v. *Broxholme*, 59 Cal.App. 623 [211 P. 473], and *Monson* v. *Fischer*, 118 Cal.App. 503 [5 P.2d 628], in arguing that "Even a licensed architect is an agent with limited authority, and it is the general rule that such architect does not have authority to unmake, change, modify, or alter the contracts of his

principal.'' That rule may be conceded, but the three cases cited have no bearing on this case since here, (a) by the undisputed testimony Clover's contract with appellants bound him to produce a set of plans which would pass inspection, and (b) respondent could not start work until he got such plans. Moreover, there was no substantial variance between the original set of plans and the revised set as far as the *wall* was concerned, since both the plaintiff and the witness Serpa testified that Clover's original plans, in addition to calling for an I-beam, provided for a wall beneath it *but that such wall had not been designed as a temporary one,* but as a permanent one, with plumbing and electric wiring carried within it. That testimony was uncontradicted. For these reasons there is no question in this case of a change or modification of a contract already made, by an architect without express or implied authority. There was no substantial change in the wall. Admittedly there was a change by the elimination of the I-beam but it does not appear how any question of agency can arise as between the defendant-owners and the plaintiff-contractor respecting such change or variance since the plaintiff had nothing whatever to do with it. Clover's contract with defendants, according to his uncontradicted testimony and theirs, was that he had to produce a set of plans which would pass the building inspector and that his obligation to the owners was a continuing one until he did so. The first set did not pass, and one of the reasons, as we have seen from Lotz' testimony, was that the I-beam was too light. The evidence, including appellants' own testimony, shows without question that appellants, who were Clover's principals, looked to him, their agent, to meet his commitment to them by revising the plans. It shows also that plaintiff, who was merely standing by, waiting for an approved set of plans, knew that defendants were looking to Clover (assisted by Thomas and Savio) to produce them. Plaintiff had no reason to make any inquiry into the nature or extent of Clover's authority. It was manifested by defendants themselves. (See *Robinson* v. *American Fish etc. Co.,* 17 Cal.App. 212 [119 P. 388], and *Fairbanks* v. *Crump etc. Co.,* 108 Cal.App. 197 [291 P. 629, 292 P. 529], both cited approvingly in *Brant* v. *California Dairies, Inc.,* 4 Cal.2d 128, 135 [48 P.2d 13].)

When the revised plans were approved by the building inspector plaintiff *for the first time* had a set of plans with which he could start work.

Clover had the authority, admittedly, to make the first set

of plans and it appears beyond question from defendants' own testimony that that authority continued until the plans were ultimately approved (see *Quinn* v. *Dresbach,* 75 Cal. 159 [16 P. 762, 7 Am.St.Rep. 138] ; *Dunlap* v. *Dean,* 109 Cal.App. 300, 308 [292 P. 991] ; *Otis* v. *Winter Inv. Co.,* 138 Cal.App. 682 [33 P.2d 4] ; Rest. Agency, § 106).

The foregoing summary of the relations of the parties simplifies the discussion of appellants' principal contention, which is *that the court erred to their prejudice in giving several agency instructions proposed by plaintiff and refusing others tendered by themselves.* They argue that plaintiff's instructions numbered 10, 11 and 14 violated the constitutional provision that ''Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law.'' (Art. VI, § 19.)

Plaintiff's instruction 11 charged the jury ''that Leonard Clover and Mark Thomas were the agents of defendants in the preparation of the original and revised plans . . . and the defendants are bound by all acts of said Leonard Clover and Mark Thomas as if they had been performed by the said defendants personally.''

Admittedly this left nothing for the jury to decide respecting the existence and continuance of Clover's and Thomas' authority.

Plaintiff's instruction 10 told the jury:

''If you find . . . that the defendants employed . . . Clover to prepare certain plans . . . which plans . . . Clover guaranteed to the defendants would meet and pass all building requirements, and . . . that by reason of the fact that the said plans . . . failed to meet the building requirements . . . and for that reason required revision thereof, and if you find that the original plans were returned, pursuant to directions of the defendants for the purpose of such revision, to . . . Clover or to Mark Thomas . . . and that said plans were revised and redrafted by . . . Clover, and subsequently delivered to the plaintiff by the said Leonard Clover and/or Mark Thomas, as being the revised and redrafted plans of the said building, *then you are instructed that the said revised and redrafted plans were the plans of defendants and that the said defendants are bound by any of the acts of the said Leonard Clover and/or Mark Thomas in the revision thereof as fully and completely as if the said defendants had authorized said parties to make the said revisions therein.''* (Emphasis added.)

Plaintiff's instruction 10 seemingly did not violate article VI, section 19 since it contains five distinct predicates based on the formula "if you find" (see *Reed* v. *Simpson*, 32 Cal.2d 444, 452 [196 P.2d 895] ; *Clarke* v. *Volpa Bros.*, 51 Cal.App.2d 173, 179 [124 P.2d 377] ; 24 Cal.Jur., pp. 841-842, § 101).

However, plaintiff's instruction 14 did charge on the facts. It told the jury "that the *evidence is uncontradicted that the original plans* . . . were prepared and drafted by Leonard Clover, with the assistance of Mark Thomas, Engineer. You are instructed that in the preparation of these original plans . . . Clover and . . . Thomas were acting as the agents of defendants in the preparation and engineering of said plans. The evidence is further uncontradicted that these original plans were modified by . . . Clover and . . . Thomas. If you should find that the defendants instructed the plaintiff to return the said original plans to Leonard Clover and/or Mark Thomas for modification, or that the defendants, by their action or conduct, negligently caused the plaintiff to believe that he was instructed to return said plans to Leonard Clover and/or Mark Thomas for modification, and that the plaintiff did return said plans to them . . . for either of the above reasons, and if you should further find that the defendants failed to notify the plaintiff that the said Leonard Clover and/or Mark Thomas . . . were no longer the agents of defendants, and that subsequently plaintiff received certain modified plans from the said Leonard Clover and/or Mark Thomas and proceeded to construct . . . in conformity with said modified plans, then *the defendants are bound by the acts of Leonard Clover and/or Mark Thomas in the modification of the said plans as fully and completely as if the said defendants had authorized said parties to make the said modifications.*" (Emphasis added.)

We agree with appellants that instructions 11 and 14 charged on the facts. We do not agree, however, "that questions respecting authority of Clover or Thomas, actual or ostensible, were essentially questions of fact for the determination of the jury." As already appears their continued agency appears by evidence which is wholly uncontradicted. As was said in *Dean* v. *Ross*, 105 Cal. 227, 231 [38 P. 912], cited by appellants: "It is only where the fact is admitted, or *there is no shadow of conflict of evidence* with respect to it, that the court is justified in taking it [i.e., a question of fact] from the consideration of the jury." (Emphasis added.) Here there was "no shadow of conflict."

At 24 California Jurisprudence, pages 836-838, section 98, it is said that a violation of article VI, section 19, "does not warrant a reversal when the facts as to which the charge is made are admitted or uncontradicted, or where no other conclusion could be reasonably made from the evidence . . ."

█ Plaintiff's instructions 10 and 14 are inconsistent one with the other since the former leaves several questions to the jury, while the latter tells the jury that those questions are settled by uncontradicted evidence. But no prejudicial error could have resulted, since the jury could not have found on any of the questions in instruction 10 otherwise than in the affirmative, and it is not "error to assume the existence of a fact which is undisputed" (24 Cal.Jur., pp. 842-843, § 101). The inconsistency presents no problem as is found, for example, in such cases as *Soda* v. *Marriott*, 118 Cal.App. 635, 643 [5 P.2d 675], where it is impossible to tell which instruction controlled the jury.

█ In their closing brief appellants say "Appellants' problem on this branch of the case therefore resolves itself into the simple one of demonstrating to this court that there was enough evidence in the record on the issue of agency, liberally viewed in the light most favorable to appellants, to justify its submission to the jury as one of fact." They are there invoking the rule that a court must give instructions if there is any substantial evidence supporting the theory of the party tendering them. But again we must say that the testimony here was so clear that Clover's authority continued until he had produced a set of plans that would pass the building inspector, that no room was left for any other theory.

Plaintiff's instructions 15, 16 and 17 merely gave the jury sections 2315, 2316 and 2317 of the Civil Code. These abstract definitions could not have raised any conflict, created any confusion, or resulted in any error.

Appellants assign as prejudicial error the refusal of their tendered instructions 10, 11, 12, 14 and 16. By these instructions, as they say, "defendants sought to have the question of agential authority submitted to the jury as one of fact." The tendered instructions were as follows:

"You are instructed that . . . Thomas, and . . . Clover . . . were not parties to the contract, and cannot, in the absence of authority, bind the owners to a change in their contract with the plaintiff . . . and themselves. Unless, therefore, you find that the owners consented to such changes as between the first set of plans and the revised plans the plain-

tiff is not entitled to recover, as there has been no substantial performance of the contract." (Emphasis added.)

"If you find from the evidence that . . . Clover, was without authority to remove the I beam and bonding beam, and that the Kluges did not consent to the removal of said I beam and bonding beam, then you must determine from the evidence whether . . . Clover, had the apparent authority or ostensible authority to bind the owners. You must as well find that the plaintiff . . . had the right to rely and did rely upon this ostensible or apparent agency. The burden of proving such ostensible authority or apparent authority is upon the party asserting it. That is, it is up to the plaintiff . . . to show by a preponderance of the evidence that Leonard Clover ... had such apparent authority or ostensible authority and that he had a right to rely upon this, and did in fact so rely." (Emphasis added.)

"You must find by a preponderance of the evidence that . . . plaintiff, was entitled to rely upon the ostensible authority of . . . Clover . . . to bind the owners, and you must further find that . . . Clover . . . did have such apparent or ostensible authority before you can have occasion to determine whether there has been substantial performance of the contract."

"You must determine whether Mr. Heple was under a duty to discuss changes in the plans with the owners before you can allow him a recovery. You shall determine from all the evidence before you whether the plaintiff . . . was in good faith, and one of the factors to consider in arriving at a determination concerning his good faith is the custom and usage in the contractors' trade."

"If you determine from the evidence and the other instructions . . . that the contractor . . . was not in good faith in proceeeding to build by the revised plans without first discussing the revised plans and explaining them to the owners, he is not entitled to recover."

These five proffered instructions were contrary to the plaintiff's instructions already discussed, which told the jury as a matter of law that Clover's and Thomas' authority continued on until an approved set of plans had been delivered to plaintiff. If our conclusion is correct that plaintiff's instructions were properly given, then these five instructions were, of course, properly rejected.

 Appellants next assign as error the giving of instructions respecting the contract between appellants and respond-

ent. The court gave plaintiff's instructions 6, 12 and 13. Plaintiff's 6 reads:

"You are instructed that in determining whether or not the plaintiff . . . has furnished substantial performance of his said contract with the defendants, you are to consider the revised plans as being the plans mentioned in the contract . . . according to which plans plaintiff was required to construct the said building for the defendants. To further clarify, *you are to completely disregard the original plans* prepared by Leonard Clover in determining whether or not plaintiff has furnished substantial performance of his contract with the defendants." (Emphasis added.)

Under the evidence this instruction was proper since plaintiff could not have commenced construction until he had legal plans to build by, and this meant, obviously, the revised set.

Plaintiff's 12 reads:

"If you find from the evidence that the defendants notified plaintiff, either orally or in writing, that they would not accept his performance unless he completed the building in conformity with the original plans, then I instruct you that you shall treat such a demand, if any, as an unwarranted condition to defendants' offer to perform their part of the construction contract, and if plaintiff had not violated the contract on his part, he was entitled to regard such demand, if any, as a repudiation of the contract by defendants, and plaintiff was justified in stopping all further work on the said contract."

In the first place, plaintiff was told by defendants in their letter of April 6, 1948, unequivocally, "do not continue your building operations," and he stopped. Secondly, plaintiff's obligation to build "as per plans and specifications" meant— and could *only* have meant—"as per *legal* and *approved* plans," hence there was no way whereby he could have "completed the building in conformity with the original plans" which had been rejected. The evidence is undisputed that appellants were in touch with Clover and Thomas with respect to the changes made necessary by the building inspector's rejection of the original plans. Any notice by appellants to respondent "that they would not accept his performance unless he completed the building in conformity with the original plans" would have been a futile and an idle act and would have rendered impossible the performance of his contract by respondent. There was no error in instruction 12.

█ Plaintiff's 13 reads:

"You are instructed that even though the written specifications, which were a part of the contract between the plaintiff and defendants in this action, provide that there could be no modifications or changes in the terms thereof except by an agreement in writing, said specifications could be altered or modified by an executed oral agreement. If you should find that the plaintiff and the defendants orally agreed to change any term or terms of the said plans or specifications and that the said plaintiff fully performed the terms of the said oral agreement of modification, then neither party to this action can now complain that the said modification or change was not authorized or valid."

Earlier we have quoted the provision in the specifications respecting changes and have pointed out that the changes which that provision was designed to cover were not such changes as were made by these revised plans since the I-beam was eliminated before construction commenced or could legally commence. However, we find no error in the instruction, of which appellants can complain.

At defendants' request the jury was given defendants' instruction 13 reading:

"You are instructed that the contract entered into between the Kluges and Heple consisted of four items; *the original plans,* the specifications, the written bid submitted by Mr. Heple, and the oral acceptance of the Kluges of that bid. The provisions of the specifications are as much a part of the contract as the bid itself, and the plaintiff . . . is bound by the terms and provisions of the specifications. The specifications provide that no omissions will be allowed unless ordered in writing by the owners. There is no evidence that the owners consented in writing to a change in the plans, and therefore unless you find that the owners waived this provision or by their conduct or acts have estopped themselves from asserting this provision, this provision requiring a writing must control. Such estoppel or waiver must be shown by a preponderance of the evidence." (Emphasis added.)

In discussing plaintiff's instruction 13 we pointed out that the provision in the specification was not designed for the revision in the plans made in this case. The same may be said respecting defendants' instruction 13. █ However, there is a conflict between plaintiff's instruction 6 which told the jury to "completely disregard the original plans" while this instruction told the jury that the contract consisted of

"the original plans." The conflict could not possibly have confused the jury, in view of the uncontradicted evidence in the record respecting the rejection of the original plans and the preparation and adoption of the revised set.

Finally, appellants claim prejudicial error in the giving of plaintiff's instruction 18 respecting the amount of the recovery. The prayer of the complaint was for $19,354.38, while the verdict was for $18,669.47, or $684.91 less. The instruction told the jury that the evidence was uncontradicted that plaintiff had expended $19,869.47 for labor, materials, equipment rental and contracting services. The verdict was for exactly $1,200 less than the latter figure, which would indicate that the jury followed the substantial performance instructions and deducted $1,200 for deviations or variances.

Appellants argue that "At the beginning of this instruction the jury was informed, as a matter of law, that plaintiff's testimony was to be accepted as true." That is not correct. It informed them that the evidence was uncontradicted, and so it was, since the plaintiff alone testified as to how much he had expended. His testimony was not contradicted and it was supported by invoices and time cards. Even defendants' witness Massett stated that he was not prepared to say that plaintiff did not expend the amount to which he testified. ▮ "(T)he jury may, provided they do not act arbitrarily, reject in toto the testimony of a witness, even though, in some cases, the testimony of such witness is uncontradicted." (27 Cal.Jur. p. 184, § 156; see, also, 10 Cal.Jur. pp. 1143-1144, § 362.) There was testimony for the defense that the fair and reasonable value of the items which had gone into the building was $15,985 but the jury did not adopt that *estimate* as against plaintiff's testimony as to his *actual outlay*. Since the verdict was for less than the amount prayed for (and $1,200 less than $19,869.47) no problem is presented of a verdict for more than the sum demanded.

There is error in the record arising from the conflicting instructions already noted, but it was harmless. We find no prejudicial error.

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 22, 1953.