[Civ. No. 16436. First Dist., Div. One. Nov. 8, 1955.]

D. R. MILLER, Plaintiff and Appellant, v. STANLEY J. BROWN, Defendant and Appellant.

764

Bohnett, Hill, Cottrell & Bohnett and R. L. Hofvendahl for Plaintiff and Appellant.

W. Gordon Eustice for Defendant and Appellant.

PETERS, P. J.—Stanley J. Brown, a builder, contracted to build a house for D. R. Miller, at a fixed price, plus extras. After the house was constructed it cost considerably more than the contract price. The parties disagreed over what items should be listed as extras. Miller paid most of the bills and brought this action against Brown to recover $9,416.78, that being the amount that Miller claims that the price of the house exceeded the contract price. Brown answered and cross-complained for $1,698.58, the amount he claimed was still due him. The trial court entered its judgment denying any relief to Miller on his complaint, and granted Brown $700 on his cross-complaint. Miller appeals from the judgment insofar as it is adverse to him, and Brown cross-appeals

from the portion of the judgment limiting his recovery to $700.

Basically, most of the problems on these two appeals are factual. The evidence on the basic issues is highly conflicting. We are, of course, bound to resolve all conflicts in favor of that evidence that supports the judgment. That evidence is as follows:

Sometime prior to the 29th of August, 1952, Miller and Brown entered into an undated written "Building Agreement." There are several important provisions of that agreement which should be quoted. They are:

"1. The Builder, acting as an agent for the owner shall purchase all materials and supervise the performance of all required masonry, [sic] iron work, rough and finish carpentry, plastering, dry wall materials, painting, glass and glazing, roofing, and rough grading, for the one story residence to be constructed [for D. R. Miller]. . . . In accordance with plans and specifications and made a part hereof. . . .

"4. Owner shall pay the labor and material bills for the construction of the above described residence in the following manner: By depositing of money to take care of costs in a joint bank account as needed during process of construction; both Owner and Builder to check and okay bills before payment; Builder to write checks for same on joint account . . .

"5. The Owner agrees that the Builder shall receive for his services the sum of 10% of the total cost of construction. . .

"6. It is further agreed that the Owner and Builder shall cooperate to keep the cost of construction down and that any benefit derived from same shall be credited to the Owner. Any changes or deviations from the plans and specifications shall be in writing and signed for by both Owner and Builder. . . .

"9. It is agreed that the total fees of the builder shall not exceed the sum of $2,100.00 although 10% of the cost may be in excess of this amount.

"10. The builder guarantees the owner that the total cost shall not exceed $28,000.00 provided that there are no changes in the plans as agreed upon."

It will be noted that this agreement requires that the house shall be constructed "In accordance with plans and specifications" that are "made a part hereof." One of the major controversies on these appeals is what was meant by that

phrase. Prior to the signing of the contract, Brown had received preliminary plans from Mr. Woodruff, the draftsman. These preliminary plans, among other things, (Ex. H) called for a basement, an oil heating system, plaster walls, hardwood floors and exterior brick veneer. They were used by Brown to secure estimates from subcontractors. On the basis of these estimates Brown submitted an estimate to Miller of $28,354.30 (Ex. 11). Miller was of the opinion that this was more expensive than he desired, and he and Brown agreed to certain changes. Based on these changes Brown submitted a document entitled: "Cost of Construction of Residence for Mr. and Mrs. D. R. Miller." (Ex. B.) The costs here submitted totalled $26,400.55. Brown testified that this cost list was the basis for the undated agreement above quoted, and Miller admitted that this was so. Brown claims that the changes then agreed upon provided for omitting the basement, substituting a gas furnace for the oil furnace, using basement heating, and using 5/16″ plank flooring for Bruce flooring. He also testified that at the time Exhibit B was agreed upon there were no other plans and specifications in existence. Construction on the building started August 29, 1952.

Woodruff, the draftsman, testified that he completed the original plans by July 31, 1952, and that on August 26th, at Brown's request, he altered the original plans so as to swing the bedroom wing around towards the patio. This change is embodied in Exhibit 4. These altered plans, he testified, he finished on August 30, 1952, and then delivered them to Brown. Brown disputed this evidence. He testified that it was not until August 30, 1952, after construction began, that he received the plans embodied in Exhibit 3, and that he did not receive the revised plans swinging the bedroom around (Ex. 4) until September 2, 1952. He was definite that the bedroom revision was not agreed upon until after the undated agreement above quoted (Ex. 1) had been signed. This conflict was for the trial court.

Admittedly, on September 8, 1952, Brown filed a request for a building permit and included in the request Exhibit 3 even though by that date the bedroom revision embodied in Exhibit 4 had been agreed upon. Brown stated, however, that he did this because the plans for the bedroom revision were then incomplete, and, had incomplete plans been filed, the permit would have been denied.

Thus, Brown's testimony is that when the undated agreement (Ex. 1) referred to "plans and specifications" it meant the original plans plus the oral modifications made to reduce costs as shown by Exhibit B. Miller disputes this evidence. He claims that Exhibits 2 and 3 are the "plans and specifications" referred to in the undated agreement embodied in Exhibit 1, and that the only alterations to those was the swinging of the bedroom wing so as to create an "L" shaped house instead of the originally designed straight line shape.

When the house was completed its total cost had amounted to $37,602.78. Toward the end of construction a dispute arose between the parties over what were proper extras. At that time Miller admittedly approved extras amounting to about $3,800. At the trial, however, Miller contended that he approved extras in that amount only in the spirit of compromise, and that the correct figure for the extras was about $2,400. The parties were unable to settle the dispute by negotiation. Miller paid all but a very few of the outstanding bills, claiming he did so only because he wanted to prevent mechanic's liens from being filed, and then brought this action for $9,416.78, the amount he claims is the difference between what he paid for the house and the contract cost, plus admitted extras and less certain claimed savings. Brown answered, and cross-complained for the amount of several bills he paid, for $700 remaining due for his services under the contract, and for 10 per cent of the value of the extras. The total amount prayed for in the cross-complaint was $1,698.58.

Miller is a real estate broker. The checkbook from which bills were paid was in his possession and he had all the canceled checks. Obviously, he knew the amount that he deposited in this account and knew how much had been paid from it. Moreover, a full accounting between the parties was had each month as to each bill that was paid. As late as July 8, 1953, Miller knew that he had already deposited $35,000 in the building account, and also knew that Brown was still writing checks on the account. During construction Miller lived near the new house, visited the site several times a week, supervised much of the work and talked with many of the subcontractors. There is no dispute over the fact that the house was constructed exactly as agreed upon.

At the trial, the basic dispute involved the charges over and above the agreed upon $28,000, the question being whether these items were "extras" or covered by the contract. The solution to this problem obviously depends upon

the determination of what was included in the contract. According to Brown, all of the following were extras:

1. *Excavating and grading*: The estimate for this item was $180. The total cost was $666.75. Brown claims that the difference was an extra because the $180 was a mere allowance and not a fixed bid. This is indicated, so he urges, by the word "Est." following the item in the contract. He contends that the extra cost exceeded the estimate or allowance because of the change in the bedroom wing plans which required more excavating of the hill back of the house than was required by the original contract. It should be mentioned that this and the other "extras" claimed by Brown are listed in Defendant's Exhibits A and C, and that these two exhibits are marked "O.K.," apparently by Miller. Miller admitted that this item was proper.

2. *The driveway*: An allowance of $100 was made for this item. The actual cost was $811.16, which admittedly included some enlargement from the final plans. The actual plans for the driveway first appear as part of Plaintiff's Exhibit 3.

3. *The septic tank*: Here was an additional $58 to that provided in the original contract. This was caused by Miller ordering a garbage disposal unit which required a larger tank. Admittedly, Miller did not expressly order this extra. Brown testified that after the disposal unit was ordered he had to go ahead with a larger tank without first securing Miller's approval.

4. *Painting*: The actual cost exceeded the bid of $1,550 by $600. The painter claimed this additional sum as an extra because of the extra painting required by the changes set forth in Exhibit 4 and other changes. Brown at first contested paying this extra sum, but Miller, by letter, ordered the sum paid. Both litigants signed the check.

5. *Electric work*: Brown testified that two electric heaters were added, totaling $100. This is "O.K.'d" by Miller on Exhibits A and C. Brown testified that Miller ordered, as an extra, underground electrical service which cost $344.76. Although the specifications and plans do not show the underground service, Miller claims that this equipment was agreed upon at the time the agreement was signed. Brown denied that this was so. Brown also testified that Miller went over the electrical wiring and O.K.'d with the subcontractor additional fixtures and outlets, adding $198.30 to the cost, and

then added mercury switches, increasing the cost by $53.68. Miller approved the $198.30 item. None of the challenged items appears on the plans and specifications.

6. *Finished hardware*: The cost of this exceeded the original allowance of $200 by $104.68. Miller had selected the hardware and had O.K.'d this item.

7. *Marble hearth*: Miller approved a change to replace the brick hearth called for by the plans and specifications with marble. This added $217 to the cost.

8. *Mirrors*: The specifications include mirrors and the original plans show mirrors. Brown contends that the plans do not "call" for mirrors, but merely indicated their location. He urges that the specifications were not part of the contract, and points out that the original agreement was based on Exhibit B which did not include mirrors. Brown urges that the mirrors were to be furnished by Miller, just like the refrigerator, washing machine and dishwasher, which were also shown on the plans, but which admittedly were to be furnished by Miller. Miller picked the mirrors out. They cost $163.39.

9. *Screen*: This admittedly was an extra.

10. *Formica*: The original plans, Exhibit H, did not indicate whether certain cabinets were to be formica or tile. Brown contends that that item was intentionally omitted because the Millers were undecided. Miller contends that it was in Exhibit 2, was understood to be part of the contract, and was not an extra. The amount involved is $315.

11. *Common Labor*: The parties dispute the amount of $504.29, the amount the actual cost of this item exceeded the original estimate. Brown testified that this cost was incurred because of the change in the bedroom wing, the digging of trenches for the underground wiring, the extending of the patios, and the labor cost of moving lumber and bricks which Miller wanted saved.

12. *Carpenter Labor*: Here the extra cost was $2,388.79. Part of this was caused by the bedroom change, which increased the size of the establishment. Brown admitted that it was difficult to trace this item. Miller admitted that additional carpenter work was caused by changing the shape of the building, and admitted that he had ordered certain changes in the bathroom windows, and additional molding and valances, and certain changes in the flooring. Miller conceded that half the claimed extra cost for this item was

justified, while Brown testified that the additional carpenter work actually exceeded the amount he was claiming.

13. *Lumber*: The change in the bedrooms added $195.19 to the lumber cost. This item was approved by Miller on Exhibits A and C.

14. *Millwork*: The cabinet maker testified as to $786.36 being the cost of extras which he itemized. These included birch panelling in the den, and many other items which he stated were directly ordered by Miller, or were caused by the change made in the floor plans.

15. *Tile*: The tile man testified to changes in the tile work ordered by Miller, totaling $466.60. This item was O.K.'d by Miller on Exhibits A and C.

16. *Plumbing*: This extra of $184.57 resulted because Miller substituted colored fixtures for white ones. Miller concedes the validity of this charge. Incidentally, it is the only extra directly authorized in writing.

17. *Sheet Metal*: Here there was an extra charge of $235.25. This was caused by the addition of the furnace room, and by the adding of metal gutters by Miller. These items were approved by Miller in Exhibits A and C.

The total of all the claimed extras is $8,097.50, of which Miller admits but about $2,400.

In addition to the "extras," the parties discuss several deletions, for which Miller claims a credit. These relate to changes in the basement, omission of the fuel tank, change in the panelling in the den, change in the veneer from the patio to the terrace, change in the flooring, etc. Whether these were deletions from the signed contract for which a credit should be allowed depends upon when they were made. Brown consistently testified that most of these changes were made before the contract was executed as part of the attempt to reduce the cost of the house and so were made before the contract was executed. He also testified that when the signed agreement referred to "plans and specifications" it referred to Exhibit H as orally modified, and that Exhibits 2, 3 and 4 were not then in existence.

Brown has been paid $1,400 as compensation under the contract, which sum he urges should not be included in the $28,000 because his compensation was not a part of "Costs of Construction" as set forth in Exhibit B and was never intended as part of the guaranteed cost.

In a memorandum decision the trial court stated that "the terms of the original contract for construction were modified by numerous oral agreements, express or implied, which tho not in writing as required by the original contract are nevertheless binding because fully executed and accepted. Plaintiff owner was at all times fully aware of these modifications or by his conduct ratified them when he did become aware."

Its findings are consistent with these views. The court found that the "total construction costs of said residence exceeded the agreed price of $28,000.00 but that said additional amounts were caused by changes, deviations, and additions to the plans requested by plaintiff and cross-defendants and for which defendant and cross-complainant is not responsible." It also found that "the changes, deviations, and additions to the original plans for the house requested by plaintiff and cross-defendants constituted a [sic] alteration or modification of said written agreement of August 28, 1952, being executed oral agreements of modification requested . . . by plaintiff and . . . performed by defendant."

Based on these ultimate facts the trial court denied any relief to Miller on the cause of action set forth in his complaint, and awarded Brown $700 on the cause of action set forth in his cross-complaint, and entered its judgment accordingly. Each party appeals from those portions of the judgment adverse to him.

The first contention of Miller is that as a matter of simple arithmetic the cost of the house, less extras, exceeded $28,000, and, therefore, a judgment in some amount should have been entered in his favor. If the $8,283.83 in extras be deducted from the admitted cost of $37,602.78, the resulting figure is $29,318.95, which, of course, does exceed the $28,000 contract price. But included in the $29,318.95 computation is the $1,400 paid to Brown as part of his compensation for supervising construction. The contract provides that the compensation of Brown shall be a percentage "of the total cost of construction," and not to exceed $2,100, so that obviously the fee to be paid Brown was not a part of the "total cost of construction." The guaranty that the "total cost" should not exceed $28,000 is therefore sufficiently ambiguous to permit the introduction of parol testimony to explain the intent of the parties. Brown testified that the parties understood and agreed that his fee was not to be considered a part of the $28,000 guaranty. Thus, the trial court was justified in its determination that the "total cost"

of the building did not exceed $28,000. This makes it unnecessary to consider other contentions of the parties on this point.

Miller next objects to the fact that the trial court did not expressly find what documents constituted the contract, and contends that this was error, citing *Haight* v. *Tryon*, 112 Cal. 4 [44 P. 318]. Insofar as this contention is based on the concept that the trial court should have made more specific findings, it is without merit. ■ The Haight case recognizes that a party cannot object for the first time on appeal to defects in the findings, such as that the challenged finding is in reality a conclusion, or that the findings are not sufficiently explicit, or are in conflict, unless he has first raised the point on a motion for a new trial. (See *Goss* v. *Fanoe*, 114 Cal.App.2d 819 [251 P.2d 337]; see cases collected 3 Cal.Jur.2d p. 648, § 163.) ■ Miller does argue that he did urge the point in his motion for a new trial by the charge "that the decision is against the law," and also contends that he raised the point in his oral argument on the motion for a new trial. Obviously, the quoted allegation, without elaboration, is much too general to raise the issue that the findings were not sufficiently specific. ■ It is equally clear, since the oral argument on the motion for a new trial was not transcribed and is not in the record, that we are limited to the record and cannot now consider points not contained in the record.

■ Miller asserts, however, that this was more than a failure to make the findings more specific, and that the failure here amounted to a failure to find on an essential issue. This may, of course, be raised for the first time on appeal. (*Mackay* v. *Whitaker*, 116 Cal.App.2d 504 [253 P.2d 1021]; *Fireman's Fund Ins. Co.* v. *Romero*, 128 Cal.App.2d 331 [275 P.2d 83].) But an examination of the findings discloses that, at most, there was some uncertainty in the findings and not a failure to find on an essential issue. ■ It is well settled that "any uncertainty in the findings is to be construed so as to support the judgment rather than to defeat it." (*Warren* v. *Hopkins*, 110 Cal. 506, 512 [42 P. 986].) And ■ "Where an alleged error results from omissions in a finding which, if corrected, would nevertheless have been adverse to the appellant, the error will not warrant a reversal." (*Matlin* v. *Crescent Commercial Corp.*, 93 Cal.App.2d 8, 12 [207 P.2d 873].)

The rule of these cases is here applicable. The basic finding here was that "changes, deviations, and additions to the original plans . . . constituted a [sic] alteration or modification of said written agreement of August 28, 1952." Thus, we have a finding that there was a written agreement of August 28, 1952, and that there were alterations and modifications of it consisting of executed changes to the original plans. These findings seem to us to be sufficiently explicit, but even if they were vague or uncertain this should have been brought to the attention of the trial court in a proper manner, which was not done.

The basic contention of Miller is that the findings are unsupported by sufficient evidence. He contends that there was no evidence of ratification by Miller of the increased cost, and claims that the sole basis of the court's decision is the fact that Miller paid for the increased charges. These contentions are unsound.

The facts have already been set forth at some length. If conflicts be resolved in favor of Brown, as they must, the record shows that Exhibit H was used by Brown to secure preliminary estimates; that these were presented to Miller, who found them to be too high; that thereupon Miller and Brown went over the plans substituting various items for those set forth in Exhibit H. From Exhibit H, as orally modified, a new cost of construction estimate—Exhibit B— was drawn up. This was the basis of the written agreement. Thus, the written contract embodied in Exhibit 1, when it referred to "plans and specifications," referred to Exhibit H as orally modified.

Subsequent to the execution of Exhibit 1, complete plans —Exhibits 2 and 3—were drafted. Then Miller, as owner, changed the basic plans by moving the bedroom wing. This increased many of the estimated costs of construction. Thereafter, Miller ordered more millwork, birch walls for the den, select birch for the cabinets, additional valances, moldings, a fancy mantel, etc., all of which are listed in Exhibit 6. Then Miller changed the type of tile agreed upon and increased its amount, added a furnace room, a metal gutter around the house, and added a garbage disposal which necessitated a larger septic tank. Then Miller ordered Brown to pay the painters an additional amount which the painters were claiming and Brown was contesting. He ordered numerous changes in the electrical specifications such as two electric heaters, mercury switches and underground service,

changed the hearth, ordered a screen, changed the location and size of windows. The record shows that extras were ordered and approved by Miller in the amount of $8,097.50. Under the law this amounted to a modification of the written contract. Miller places great reliance on the provision of the contract which provides that alterations must be in writing, and points out here that he only approved one alteration in writing. But under section 1698 of the Civil Code, an executed oral agreement may alter an agreement in writing, even though, as here, the original contract provides that all changes must be approved in writing. This is so because the executed oral agreement may alter or modify that provision of the contract as well as other portions. (*Heple* v. *Kluge*, 114 Cal.App.2d 473 [250 P.2d 694] ; *Nuttman* v. *Chais*, 101 Cal.App.2d 476 [225 P.2d 660] ; *D. L. Godbey & Sons Const. Co.* v. *Deane*, 39 Cal.2d 429 [246 P.2d 946].)

 Miller's basic claim seems to be that, according to his interpretation of the evidence, many of the so-called executed oral modifications were in fact part of the original contract. This contention is predicated on his belief that Exhibits 2, 3 and 4 constituted the ''plans and specifications'' referred to in the written contract. If this were true then, of course, the judgment would have to be reversed. But this evidence is contradicted by substantial evidence offered by Brown to the effect that these exhibits were not in existence on August 28, 1952, and so did not form part of the contract. The trial court believed Brown. This was, of course, a fact question for the trial court. (*Luitweiler etc. Co.* v. *Ukiah etc. Co.*, 16 Cal.App. 198 [116 P. 707, 712] ; *Fiddyment* v. *Johnson*, 18 Cal.App. 339 [123 P. 342] ; *Thomson* v. *Leak*, 135 Cal.App. 544 [27 P.2d 795] ; *Morrison* v. *Willhoit*, 62 Cal.App.2d 830 [145 P.2d 707].)

 Miller contends that it was error to admit into evidence over his objection Exhibit B, which is an itemized list of the cost of construction of the Miller house. The trial court first excluded this exhibit, but later reversed this decision, and admitted the exhibit. The last ruling was undoubtedly correct. The contract to construct the house is embodied in Exhibit 1. This contract does not contain the plans and specifications, but refers to plans and specifications as being part of the contract. Exhibit B is an itemized list of the costs of construction which admittedly was the basis

of the agreement. Exhibit B was not a separate contract or agreement, but was introduced to show what was referred to in the written agreement. This was proper under section 1647 of the Civil Code which provides that ''A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates.'' The parol evidence rule of the Code of Civil Procedure, section 1856, and Civil Code, section 1625, has no application. Where the terms of a written contract are ambiguous or uncertain, parol evidence is admissible, not to vary the terms of the written contract, but to explain them. (*Bartel* .v. *Associated Dental Supply Co.*, 114 Cal.App.2d 750 [251 P.2d 16]; *Barham* v. *Barham*, 33 Cal.2d 416 [202 P.2d 289]; *Schmidt* v. *Macco Const. Co.*, 119 Cal.App.2d 717 [260 P.2d 230].) Certainly the reference in the written contract to the ''plans and specifications'' was uncertain. From that agreement it is impossible to determine what is meant by ''plans and specifications.'' Parol evidence was clearly admissible to show that Exhibits 2, 3 and 4 were not then in existence, so could not be the documents to which reference had been made. Parol evidence was also clearly admissible to show that the ''plans and specifications'' referred to were those contained in Exhibit H. But since these plans were themselves obviously incomplete, parol evidence was admissible to show the agreed upon parol modifications and extensions of these plans and specifications. This is what Exhibit B purports to portray. It constitutes part of Brown's proof of what he contends were the actual plans and specifications referred to in the written contract.

Miller next urges that because certain plans and specifications were filed with the building inspector, they, and they alone, must be considered as the ''plans and specifications'' referred to in the written contract, citing *Heple* v. *Kluge*, 114 Cal.App.2d 473 [250 P.2d 694]. But that case involved a situation where it was conclusively established that the plans submitted to the building authorities were the plans intended by the parties to be the basis of their contract. Thus, the holding in that case is not that the plans submitted to the building authorities were controlling, but is that those plans were the plans intended by the parties to be controlling. That is not this case.

The last contention of Miller is that in one respect the trial court unduly restricted cross-examination of Brown. Brown had testified on direct that he had performed other

jobs in the area as part of his proof as to his qualifications. On cross-examination Miller tried to bring out that on four of these other jobs Brown had gone over the contract price. The court sustained, and properly so, objections to these questions. Had the questions been permitted, evidence as to all the facts and circumstances surrounding those four cases would have been admissible, and those four cases would have had to be tried along with this one. Such collateral issues were properly excluded.

The cross-appeal of Brown is equally without merit. [14] Brown urges that the trial court improperly refused to find that he was entitled to certain sums paid for withholding taxes, for unemployment taxes, for unemployment insurance and workmen's compensation, and for repairs of a cement slab. These cannot be classed as extras. In fact, Brown admits that these charges ''are not even in the category of extras.'' This being so, if they were added to the cost of construction, such cost would exceed the $28,000 contract price. Obviously, these charges could not be allowed Brown without violating the terms of the contract.

Brown also claims that there were $8,097.50 extras authorized by Miller above the $28,000 agreed price, and that he should be paid 10 per cent of the cost of these extras, or $809.75. This involves a construction of the contract. It provides that: ''It is agreed that the total fees of the builder shall not exceed the sum of $2100.00 [less than 10 per cent of $28,000] although 10% of the cost may be in excess of this amount.'' There was no evidence of any parol executed agreement modifying this term of the contract. The trial court was correct, therefore, in its holding that Brown, who had been paid $1,400, could only recover $700 on his cross-complaint.

Thus, the appeals of both Miller and Brown are without merit.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied December 8, 1955, and plaintiff and appellant's petition for a hearing by the Supreme Court was denied December 28, 1955.