In the Matter of **Ralph E. STOLKIN,**
Debtor.

**Ralph E. STOLKIN, Appellant,**

v.

**Ruth Stolkin MARCH, Claimant-Appellee.**

**No. 71–1095.**

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1972.

Decided Jan. 16, 1973.

James M. Shellow, Stephen M. Glynn, Milwaukee, Wis., for appellant.

Marvin M. Mitchelson, Century City, Cal., Ira S. Kolb, Lloyd Kupferberg, Robert Dunn Glick, Nicholas G. Manos, Leonard Gesas, Norman H. Nachman, Chicago, Ill., for appellee.

Before DUFFY, Senior Circuit Judge, PELL, Circuit Judge, and DURFEE, Senior Judge.[*]

PELL, Circuit Judge.

Stolkin, the debtor in Chapter XI bankruptcy proceedings, appeals from the district court order confirming the referee's order which denied Stolkin's petition to reconsider the allowance in full of the claim of his divorced wife, Ruth Stolkin March.[1]

The facts presented to us constitute a tale of wheeling-dealing high finance, the telling of which to a considerable extent projects the result which we reach. Before such recounting, however, certain preliminary matters require disposition.

---

[*] Senior Judge James R. Durfee of the United States Court of Claims is sitting by designation.

[1] This appeal was consolidated for a hearing with the combined appeals in Causes

No. 71–1406 and 71–1407, appeals by Stolkin, the debtor, of the allowance of various fees in the proceedings below.

■ Respectable authority, 3 Collier on Bankruptcy ¶ 57.23[6], at 370 (14th ed. 1971), states that whether or not a petition for reconsideration will be granted is within the sound discretion of the referee and "a review or an appeal may not be taken from a denial thereof." The text cites contrary authority and, while we recognize the possibility of policy factors which might militate against allowing an appeal because of the resultant delay in the completion of the bankruptcy procedures, we question whether the exercise of discretion which would result in the payment of a substantial amount of the estate's assets, here approximately three and a half million dollars, should not be reviewable in the posture of the case here involved. Stolkin has arguably presented matters in the petition which were not known to him at the time the claim originally was allowed and which presumably therefore would have had the effect of causing him not to appeal directly from the allowance of the claim. We accordingly consider the appeal.

■ In so doing, however, we confine the scope of the review to whether there was an abuse of discretion. For that purpose, we are primarily concerned with the assertions in the petition since the referee's order of denial concluded "as a matter of law" that the petition failed to state a claim upon which relief could be granted and that there was not cause alleged, according to the equities of the case, for reconsideration. While the four corners of the petition are the primary object of consideration, we may properly assume that the referee had knowledge of pertinent developments in the Stolkin bankruptcy arrangement proceedings. This assumption pertains to that which was before the referee in the form of the file in the case even though referee Tieken, who entered the order in question, had been assigned to the case only about five months.

Further, prior to argument in this court, March filed a motion for leave to supplement the record by the inclusion of certain pleadings filed by Stolkin in a California civil action in which he sought to recover substantial damages from March and others for alleged fraud and deceit, breach of contract, and interference with contract. The basis for the California pleadings was the same factual syndrome involved in the petition before the referee. The referee, of course did not have this information before him in making his ruling. We therefore initially examine the case without regard to the supplemental materials. On the other hand, since Stolkin has stated he had no objection to the granting of the motion to supplement, we will consider the proffered pleadings insofar as they have materiality in our determination of whether there is a necessity for remanding this case for an evidentiary hearing.

Looking first then at the Stolkin petition for reconsideration we find the following allegations, which we present in summary form as asserted by Stolkin, without regard to the fact that the lack of verity of a substantial part of the allegations could not have been other than obvious to the referee.

After a marriage of some 22 years, Stolkin and March separated in 1964. Ultimately, divorce proceedings were instituted in both Illinois and California. Negotiations were conducted through attorneys and an oral settlement was arrived at, which March refused to honor upon learning that Stolkin was planning a remarriage. March caused the delay in consummating a written agreement by insisting upon having a conference with her father, her adviser, which conference was to occur on her next monthly visit with him. Eventually, in April 1967, Stolkin and March entered into a written property settlement agreement a copy of which was attached to the petition. This was typified in the petition as a conditional agreement. Stolkin, inter alia, agreed to pay March the sum of $3,400,000 on May 1, 1968, upon the occurrence of certain conditions, which conditions were not included in the written agreement. One was that his shareholdings in National Video Corporation

(NVC), then valued in excess of $20,-000,000, should appreciate to its former worth of approximately $100,000,000. His shareholdings in NVC would not in any event decrease in value from its then worth in excess of $20,000,000. March would accept 151,000 shares of NVC as security. March would make no attempt to dispose of the shares of NVC in the event of the failure of the conditions. Between May 1, 1968, the due date on the payment, and August 1968, the date of the filing of the Chapter XI proceeding, March, "fully aware of the failure of consideration," failed to make demands for the payment, failed to enforce her security rights by sale of the collateralized stock, and failed to file any action to enforce payment. Debtor's obligation to pay the specified amount was voided between May 1968 and January 1969 (the date of the allowance of the claim) because Stolkin's holdings of NVC became severely depreciated and decreased by over $10,000,000 and at the time of the January 14, 1969, hearing was valued at less than $6,000,000. NVC had filed a Chapter X bankruptcy proceeding. The property settlement agreement allegedly was entered into and signed by the parties under "the foregoing mutual mistakes of fact," said mistakes consisting of erroneous information about the then present state of and prospects for the color television industry, more particularly as those facts related to the present state of and prospect for NVC.

The second ground in Stolkin's petition was categorized as undue influence and duress. It is based upon the alleged fact that after the parties had already agreed orally upon a $1,000,000 payment to March, she, learning of Stolkin's proposed remarriage, as to which he was under extreme pressure, took advantage of him and "his anxiety with respect to protecting his fiancee from unfavorable publicity and delay." While it is not explicitly alleged, the inference is that the more favorable written agreement of April 24, 1967, was not only forced upon Stolkin but his attorneys as well.

The final factual situation in which Stolkin finds numerous and diverse grounds for reconsideration of the allowance of the claim and which is the most extensive of the bases word-wise, and which was the principal contention on this appeal, is that a new agreement was entered into between him and March between May of 1968 and January 14, 1969.

The agreement of April 24, 1967, was in writing and provided, inter alia, the following:

"18. This agreement embodies the entire understanding of the parties. It may not be altered or terminated except by written instrument executed by the parties and shall be governed by the law of the State of Illinois applicable to agreements entirely to be performed therein. The parties agree that this agreement shall be enforceable in any state, the courts of which have jurisdiction over the parties."

The alleged new agreement was oral. The background was said to be as follows. During the particular period of time, March and Stolkin were on very friendly terms and were mutually interested in the welfare of their children, only one of whom apparently was a minor. March had great confidence in Stolkin's business judgment and frequently expressed her desire to be helpful and cooperative. She had instructed her attorney to cooperate completely with Stolkin and his attorney. Stolkin held a controlling interest in M P I Industries, Inc. (MPI), a valuable holding. A merger into another company was indicated as being a wise course. Stolkin devoted all of his time to securing the most advantageous terms for a merger agreement. He thought at first that March's attorney was being cooperative; however, he became apprehensive when the attorney belittled the merger possibilities by phrases such as "pie in the sky."

Expressing these apprehensions to March and her father, Stolkin was repeatedly assured that the attorney would

cooperate. Stolkin assured March that it was still his desire to give her the entire $3,400,000 if it was economically feasible even though he was under no legal obligation to do so, presumably referring to the fact that he had been overreached and there was a mutual mistake of fact regarding NVC. Exploration developed two possibilities of mergers, one with DeSoto, Inc., owned 51% by Sears, Roebuck, who would be a principal customer of DeSoto as it had theretofore been.

Arrangements were made to the end that Stolkin would be able to purchase the Sears shares. Stolkin was reasonably certain that an analysis of the proposed transaction would result in an opinion that a merger with DeSoto would provide the most stability and future growth potential with the least risk and best dividend income return on capital invested. This would provide a very solid foundation on which to rebuild not only Stolkin's future but also that of the parties' children. Stolkin, however, in favoring the DeSoto deal did not do so casually but only after comparing it with other possibilities which he had explored. One of these was with Holiday Inn which allegedly would have resulted in an immediate $18,000,000 recovery by him. Stolkin apparently favored the stability of the long haul and was not tempted by the lure of the immediate substantial cash increment although at all times he indicated unless March cooperated with him he might have to go the Holiday Inn route.

The cooperation he suggested was that she accept $1,000,000 in cash and $2,400,000 in DeSoto stock. Stolkin would vote the shares but the stock would be placed in trust and March would get all of the dividends which would amount to approximately $60,000 per year for her life, with the stock then to go to the children. March was told by Stolkin that if the change in the agreement was acceptable to her he would not oppose "the proving up of her claim." March and her father agreed wholeheartedly to the terms of the new agreement and on

divers occasions assured Stolkin that not only they but their attorney would cooperate. Further ramifications of the merger with DeSoto then developed. Stolkin had the possibility of getting a loan from Sears which would require selling some of the DeSoto stock or he could get a firm commitment for a multi-million dollar loan from a consortium of European bankers which would allow him to keep all of the DeSoto stock. While Stolkin was busy arranging the financing and the mechanics thereof, March's attorney was apparently busy harpooning the arrangements, the upshot of which was that the attorney refused to grant a few days time to let the European loan come through and even refused to go across the street for the purpose of receiving an assurance that the loan was in process.

The attorney insisted that the DeSoto stock resulting from the merger be sold immediately, and in fact it was sold, at great loss to Stolkin. Stolkin was threatened by the attorney with being put in jail for failure to comply with a federal court order and was told that the Chapter XI proceedings would be thrown into ordinary bankruptcy adjudication proceedings unless he bowed to the demands of the attorney. March's attorney at this time was also the attorney for the creditor's committee.

In addition to those terms hereinbefore mentioned of the alleged oral agreement, $2,400,000 of DeSoto stock would be pledged as security to the European bankers and, in the event that Stolkin was unable to obtain control of the merged company and was forced to sell his holdings or should his holdings in NVC further depreciate, then March's claim would be determined by the bankruptcy court on the basis of all the equities and circumstances. A voting trust of the shares would be created for the benefit of Stolkin. Because March agreed to all of these provisions, Stolkin raised no objection to the approval of the $3,400,000 claim in the form in which it was specified in the written property settlement agreement. Because

of the actions of the attorney, Stolkin ultimately had to sell almost all of the resulting DeSoto shares.

Finally, it is asserted that because of the drastic changes of circumstances, considering the equities of the case (and we do not intend to ignore equities), the referee was urged to reconsider his prior approval of the claim.

While we do not have before us the determinative factors which went into the referee's decision to deny the petition to reconsider, we will first of all in effect place ourselves in the position of the referee and view the matters as they were, or must have been, apparent to him. Essentially, this would mean that the referee would have taken as true the allegations of the petition. We qualify the statement by the word "essentially" because we do not deem this as being completely the equivalent of the situation in which a court considers a motion to dismiss a complaint on the basis that it fails to state a cause of action. The element of discretion is present in the situation we here have involved and, while the allegations may be generally considered as true, we do not conceive that the referee is required to disregard reality or accept that which is devoid of plausibility. In the case of the motion to dimiss the complaint, the court may well feel that the plaintiff has an impossible task of proving that which he has alleged, but this is not the basis for his inquiry. Here, on the motion to reconsider, however, admittedly a discretionary matter, we hold that the referee is not as strictly limited.

An initial situation presenting itself to the referee was that the petition was filed by a California attorney designated as special counsel for Stolkin. The attorney, Norman Nachman, who had represented Stolkin in the initiation of the Chapter XI proceedings and who had represented him in all matters to that point, who was a highly respected member of the bankruptcy bar, refused to sign the petition for reconsideration. At one point the referee on his own motion had entered a rule to show cause why the petition to reconsider should not be stricken and expunged for failure of a signature of a member of the bar of the court. This matter, however, if a violation of the local rule, we do not consider determinative. Likewise we do not attach any particular significance to the refusal to sign the petition by Stolkin's attorney even though he was intimately acquainted with all of the proceedings to that time.

While we have given no consideration to Nachman's failure to sign the petition for reconsideration beyond that which was evident to the referee, namely that Stolkin's attorney had not signed the petition, it is of interest to note Nachman's version as contained in his brief in Cause No. 71–1406, an appeal arising out of a dispute over fees between Nachman and Stolkin, which appeal was heard on a consolidated basis with the present case. According to Nachman's brief, he was talked to by Stolkin's son-in-law in January 1970 regarding a reconsideration of the claim of March. Nachman advised Stolkin that he knew of no legal basis for reopening the claim and suggested an attempt at a voluntary amicable reduction. Mitchelson, a California lawyer, agreed to prepare the first draft of an application to reopen the March claim and Nachman had conferences with Schwartz, attorney for March in an attempt to obtain a voluntary reduction. At one time Schwartz had agreed to $500,000 reduction which Stolkin rejected.

In April 1970, Mitchelson submitted to Nachman a draft of a complaint seeking relief on the grounds of duress in the procurement of the divorce settlement, mutual mistake and lack of consideration. Nachman again recommended seeking a voluntary reduction. On August 3, 1970, Nachman reported to the referee that he intended to seek reconsideration of March's claim. "Shortly thereafter, Mitchelson submitted a revised petition for reconsideration of the March claim, which, for the first time contained allegations of a new agreement made between Stolkin and March

between August 6, 1968 and January 14, 1969. Nachman advised Mitchelson that neither he nor anyone else in his firm would sign the revised petition, as required by Rule 11 of the Federal Rules of Civil Procedure, because the allegations of that alleged new agreement were contrary to and inconsistent with the record in the case and to the facts previously disclosed to Nachman. Nachman thereafter refused to represent Stolkin on the merits of the March claim."

It is further of interest to note under the factual recital contained in Nachman's brief that nine months expired from the time of initial discussion of a possible reconsideration of the claim until a motion was filed and the matter was formally brought to the attention of the referee. Also, it is of interest to note that apparently the theory that a new agreement had been reached was not communicated to Stolkin's bankruptcy attorney until some eight months after the initial contact about the reconsideration and approximately four months after a draft had been prepared setting forth grounds for reconsideration, all of which grounds have now been abandoned on this appeal.

In view of Stolkin's appeal and his petition to the effect that the equities of the case required the court to reconsider its prior approval of March's claim, the referee must have been particularly struck by the obvious badges of lack of good faith.

In his first basis for reconsideration, Stolkin referred in detail to a conditional agreement contending that the payment of the sum of $3,400,000 was to be made only upon the occurrence of certain specified conditions which had failed to materialize. There was, however, before the referee, as an exhibit to the petition, a copy of the property settlement agreement. This obviously, carefully lawyer-drawn document completely negated any good faith claim of a conditional agreement on the payment of the $3,400,000. Thus, two subpara-graphs of the agreement read as follows:

"(b) RALPH agrees that in full and final satisfaction of such marital and property rights, to pay to RUTH absolutely and in any and all events, the sum of THREE MILLION FOUR HUNDRED THOUSAND DOLLARS ($3,400,000) in cash in a lump sum on May 1, 1968, or at such earlier date as RALPH may elect, tax free to RUTH. In the event of the death of RALPH before he has paid RUTH the full sum of THREE MILLION FOUR HUNDRED THOUSAND DOLLARS ($3,-400,000) as herein provided, the obligation of RALPH to pay RUTH the full sum of THREE MILLION FOUR HUNDRED THOUSAND DOLLARS ($3,400,000) shall become a lien, claim and charge against RALPH's assets and estate. In the event of the death of RUTH before RALPH has paid RUTH the full sum of THREE MILLION FOUR HUNDRED THOUSAND DOLLARS ($3,400,000), the obligation of RALPH to pay RUTH the full sum of THREE MILLION FOUR HUNDRED THOUSAND DOLLARS ($3,400,000) shall be paid by RALPH to RUTH's estate, executors, administrators or personal representatives.

"(c) RALPH agrees to pay RUTH interest on the sum of THREE MILLION FOUR HUNDRED THOUSAND DOLLARS ($3,400,000) at the rate of three and 53100ths per cent (3.53%) annually, payable monthly, the first monthly installment of interest to be paid on June 1, 1967, and a like installment of interest to be paid on the same day of each consecutive month thereafter until the full sum of THREE MILLION FOUR HUNDRED THOUSAND DOLLARS ($3,-400,000) has been paid by RALPH to RUTH."

Further subparagraphs of the agreement provided with specificity a collateral security provision to support the obligation to pay the specified sum.

These claims of mutual mistake of material fact and failure of condition subsequent were abandoned on this appeal.

The procession of badges of lack of good faith continued through the claim of undue influence and duress. The precise spelling out of terms, provisions and conditions contained in the property settlement agreement as a whole belies any claim that Stolkin was overreached. Further, the agreement specifically states the following:

"(f) RUTH has employed and had the benefit of the counsel of BENJA-MIN B. DAVIS of Chicago, Illinois, as her attorney. RALPH has employed and had the benefit of the counsel of SIDNEY R. KORSHAK as his attorney. Each party has had the benefit of study, investigation, advice and recommendations with reference to the subject matter of this agreement and their respective rights."

Further, Stolkin's references in his petition to his own financial acumen and that March had many times over the years made known her confidence in his business judgment does not set well with the claim that she had taken advantage of him in the property settlement agreement.

The claims of undue influence and duress were also abandoned on this appeal.

The principal contention of Stolkin on this appeal, that between May of 1968 and January 14, 1969, he and March had entered into a new oral agreement, is met at the outset by the hurdle of the following specific and precise language of the property settlement agreement:

"18. This agreement embodies the entire understanding of the parties. It may not be altered or terminated except by written instrument executed by the parties and shall be governed by the law of the State of Illinois applicable to agreements entirely to be performed therein. The parties agree that this agreement shall be enforceable in any state, the courts of which have jurisdiction over the parties."

The new agreement pleaded by Stolkin in his petition, of course, was an attempt at oral modification of a written agreement and by the terms of the property settlement the same would have no validity. While the law of Illinois would govern an interpretation of the agreement, the parties agreed that whether the agreement was effectively modified would be governed by the law of California since that was where the alleged oral modification occurred. The California statutes might seem to impose a further barrier to Stolkin's position. Section 1698 of the California Civil Code provides: "A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise . . ." Section 1661 of the Code provides: "An executed contract is one, the object of which is fully performed. All others are executory."

Stolkin acknowledges that as late as 1952 there was a conflict among the California courts as to the meaning of § 1698 but asserts that the conflict was recognized and resolved by the Supreme Court of California in D. L. Godbey & Sons Constr. Co. v. Deane, 39 Cal.2d 429, 246 P.2d 946 (1952).

The court in *Godbey* held that a cause of action was alleged when based upon an oral modification of a written contract which averred an adequate consideration for the oral modification and full performance on the part of the party seeking to enforce the orally modified agreement.

■ While we have some difficulty in discerning how the California court arrived at its interpretation of the clear language of the statute, and duly note the vigorous dissent filed to the opinion, it appears that Stolkin is correct in his assertion that *Godbey* now represents the law of California. Whether we agree with the interpretation of the California statute or not, the construction put on it by the California courts is controlling upon us.

In the case of MacIsaac & Menke Co. v. Cardox Corp., 193 Cal.App.2d 661,

670, 14 Cal.Rptr. 523, 528 (1961), it was stated that an oral agreement fully executed by one party, if supported by consideration, will constitute a valid modification of a prior written agreement. *See also* Weber v. Jorgensen, 16 Cal. App.3d 74, 93 Cal.Rptr. 668, 671–673 (1971). Further, it appears that an executed oral agreement may alter an agreement in writing even though the original contract provides that all changes must be approved in writing. Miller v. Brown, 136 Cal.App.2d 763, 289 P. 2d 572, 579 (1955).

However, for the *Godbey* result to be applicable, it appears that there must be two factors present: (a) an adequate consideration for the oral modification and (b) full performance on the part of Stolkin. An examination of the proposed modification casts grave doubts on the existence of adequate consideration. The judicial exercises and some of the semantic mysteries of the concept of consideration are discussed and analyzed in 1 Corbin on Contracts § 109 et seq., at 486–675 (1963 ed.).

■ Viewing the supposed oral modification from the point of view of benefit to March, we fail to discern any aspect of benefit to her. In the property settlement agreement, she had a secured explicit promise to pay her a specified amount on a specified date with a specified interest rate. On the other hand, under the supposed oral modification, the amount of cash she was to receive was reduced from $3,400,000 to $1,000,000. Secondly, contingent upon Stolkin obtaining control of MPI-DeSoto, Stolkin would set up a trust of DeSoto common stock in the principal amount of $2,400,000 with a lifetime income of approximately $60,000 to March. She was not to be the owner of this stock but merely the life beneficiary. The stock was to be pledged as security to an undesignated consortium of European banks. The $60,000 income was not guaranteed but as in the case of any other common stock dividend would depend to a considerable extent on the fortunes of the company involved. If the full sum which it had been agreed in writing would be paid to March had been paid to her, she could make her own investments and could suffer or benefit from the consequences. Here she had no voice or control over what would happen to the investment which would be entirely out of her hands. The stock in the trust was not to be voted by her but was to be voted by Stolkin. If Stolkin was unable to obtain control of MPI-DeSoto or was forced to sell his holdings or should his holdings in NVC further depreciate, then her claim would be thrown into bankruptcy court for further consideration. While there is window dressing in the petition with regard to the concern of Stolkin to provide for his children, it would appear that March would have been in a position to have carried out this commendable objective with $3,400,000 in cash. We are singularly unimpressed with the benefits flowing to March from the supposed oral modification.

■ As Corbin points out, however, it has often been said that consideration is legally sufficient if it is either a benefit to the promisor or a detriment to the promisee. 1 Corbin, *supra*, § 122, at 523. Stolkin urges that there was detriment to him because he could have had a merger with Holiday Inn which would have resulted in an immediate $18,000,000 profit to him.

We can find substantial support for the referee not having abused his discretion in determining on the basis of the situation before him that there was no detriment to Stolkin in what he agreed to do in exchange for the claimed promise of March. We differentiate at this point between a legal detriment to Stolkin by an agreement to merge the corporations and the detriment which he might have had if he had actually had the oral agreement claimed and thereafter March had reneged on her part with the result that he did not get to keep control of the DeSoto stock. Looking solely at the detriment on his promise to merge the two corporations there is ample reason for thinking that from his

viewpoint the DeSoto merger was a better long-term proposition than the Holiday Inn one was. This, at least, was his determination.

 Stolkin also claimed detriment in that he forbore from asserting the invalidity of the property settlement agreement. As we have indicated hereinbefore and as will be shown hereinafter by hindsight, the forbearance was illusory and specious. Forbearance to press his claim or promise of such forbearance may be of sufficient consideration even though the claim is wholly ill-founded. However, it appears that the forbearance to press a claim is not sufficient consideration unless the claimant has some reasonable ground for belief in the justice of the claim. In other words, the claim must be made in good faith. 1 Corbin, *supra*, § 140, at 596.

 Bearing in mind that the referee was acting in an equity capacity, we find substantial support for a discretionary determination by him for finding a gross inadequacy of consideration. See 1 Corbin, *supra*, § 128, at 551.

Irrespective, however, of any arguability on the legal sufficiency of the consideration as the matter was presented to the referee, we find that there was not full performance on the part of Stolkin as required by the California decisions. It is true that he proceeded with the merger but this is something he desired. He did not, however, perform by the payment of the $1,000,000 nor was there any evidence that he had made any arrangements for the trust that he was to create.

Other factors in the totality of the situation before the referee are not insignificant but lend weight to the correctness of the referee's decision. Among these are the following: even though Stolkin claimed he was amply solvent, he was in a bankruptcy Chapter XI proceeding and if a different agreement had been entered into with regard to a secured creditor, *i.e.*, his wife, he failed wholly to advise the referee of this fact but instead stood by and let the referee approve the claim on the basis of the property settlement. There was a substantial delay in bringing the matter to the attention of the referee. The supposed modified agreement was ambiguous and would have been at best questionably enforceable by March if she had desired to do so.

In ultimate analysis, Stolkin's complaint is not so much that the claim was allowed in the amount of $3,400,000 as a lump sum payment, but rather that he was compelled to sell the 700,000 shares of DeSoto stock. However, the court order of October 9, 1969, directing the sale of the 700,000 shares was upon Stolkin's own petition. There is strong basis for belief that Stolkin was building his case as he went along. No petition to reconsider the allowance of March's claim in the form it was allowed was filed from November 5, 1969, the date March allegedly breached the oral agreement, to September 8, 1970, some eleven months later, the date of the filing of the petition to reconsider.

Appellate courts are sometimes wont to say "we might or might not have reached the same result as did the lower tribunal but we cannot say that the lower court erred." This would be particularly applicable in the present case where we are reviewing the exercise of equity discretionary powers. However, the record in the instant case which was before the referee causes us to observe that we would have reached the same result as did the referee.

Had there been any doubt in our minds as to the correctness of the referee's decision, which there is not, hindsight provided by certain judicial admissions of Stolkin would nevertheless have made clear that our decision to affirm the referee's action was correct.

 It is hornbook law that on appellate review we are concerned with the record as it existed for the tribunal whose ruling is under challenge. We do not for that reason bottom our decision on the judicial admissions contained in the California pleadings even though

they came into the record before us without objection by Stolkin. We cannot, however, ignore the significance that these judicial admissions would have if there were a hearing below on a remand order.

The California pleadings began with a complaint filed on February 17, 1971, by Stolkin against his former wife, her father, and defendants Does I through X inclusive. The complaint sought declaratory relief and damages for breach of contract and inducing breach of contract. A procession of amended complaints followed, with the fourth amended complaint being filed in March 1972. Each of the complaints was verified by Stolkin indicating that he had read the complaint and knew the contents thereof and certified that same was true of his own knowledge except as to any matters which were stated upon information and belief and those matters he believed to be true. A reading of the Fourth Amended Complaint indicates that the stance of Stolkin in his efforts to pursue his former wife for damages was as follows:

He and March "both believed that instead of payment in cash and payment all at one time, it would be advantageous to both, and to the children of the parties," if the payment were made in the form of $1,000,000 cash immediately and the balance of $2,400,000 in shares of DeSoto stock. We find no claim of the new oral contract as alleged in the petition for reconsideration.

The Fourth Amended Complaint pleads that Stolkin had a valid obligation to pay March the sum of $3,400,000 by reason of the property settlement agreement in full and in cash on or before May 1968. The contract relied upon in the Fourth Amended Complaint is an oral agreement that if the plaintiff would not effect the merger of MPI with Holiday Inn but instead would effect a merger with DeSoto, then March would not seek any orders from the bankruptcy court to force plaintiff to lose control of or sell any shares of stock in DeSoto acquired by him. This is not

the oral modification upon which Stolkin proceeded in his petition for reconsideration. Under the contract asserted in the Fourth Amended Complaint, March had a clear right to receive the allowance of her claim as provided for in the property settlement agreement. She only was not to seek a bankruptcy court order to force the sale of the shares of stock in DeSoto.

Her doing so might or might not present a basis for Stolkin's seeking damages against March. We express no opinion on that subject. It is for other courts to decide upon the merits of that claim. The gist of the Fourth Amended Complaint is not that March had any agreement to take $1,000,000 in cash and the balance of her claim in some form of stock in trust, as urged in the petition before the referee. Rather it is asserted in California that she violated her agreement not to exercise her otherwise legal right as an approved creditor to force Stolkin into ordinary bankruptcy proceedings unless he sold all of his stock in DeSoto acquired by the reason of the merger.

The following additional matters of interest are noted in the Fourth Amended Complaint. In the Original and First Amended Complaints the attorneys [apparently Mitchelson who drafted the petition for reconsideration] "inadvertently misunderstood certain facts furnished by plaintiff, misinterpreted the law, and incorrectly pleaded certain matters therein. . . ." Stolkin, because of his confidence and trust in the attorney failed to read carefully the phraseology and "carelessly but with innocent intent verified the said pleadings." New counsel was retained by prior counsel of record [Mitchelson] to draft the Second Amended Complaint and, after a demurrer was sustained thereto, the Third Amended Complaint. The new attorney insisted that prior counsel require that plaintiff carefully read and have explained to him the allegations in the Second and Third Amended Complaints and the new attorney believed that this had been done but in truth it had not

been and again Stolkin "carelessly verified the said pleadings, and without reading the words of verification."

Further, we note the following in the California pleadings. The new attorney met and spoke with Stolkin for the first time after the filing of the Third Amended Complaint and therefore the deletion of certain matters was required which had been misunderstood by the attorneys who had drafted the previous pleadings. The promise apparently absolute on its face to pay the $3,400,000 was not subject to conditions as had been previously alleged but was involved in circumstances which influenced Stolkin in the making of the property settlement agreement. Because of the circumstances, he believed that fairness required that some compromise be made by March. Stolkin further believed that if March did not voluntarily agree to some change in the agreement "he had a legal right to seek some relief by the bankruptcy court, but at all times, plaintiff knew that he had no chance of obtaining such relief." Stolkin "at all times believed that, since he was represented by counsel at the time that said Property Settlement Agreement was made, he could not successfully raise any defense to any obligation contained therein on the ground of duress or undue influence." The reason Stolkin did not pay March the said $3,400,000 was that he did not have that amount of money in cash available to him. While he did tell March that he could attempt to seek some relief by reason of change of circumstances or other factors, "this statement was made by plaintiff solely in the hope that defendant MARCH, to avoid any such contest, would voluntarily give plaintiff more time to pay the said amount or make some other compromise. At no time did plaintiff believe or contend or state the defendant MARCH's claim was invalid or void for fraud. Nor did plaintiff ever believe or contend or state that he had any reasonable chance of obtaining any relief from

the bankruptcy court from this obligation to pay defendant MARCH the said $3.4 million dollars."

"Further, [t]his Fourth Amended Complaint omits all prior erroneous allegations of an agreement between plaintiff and MARCH concerning her said claim in bankruptcy. . . . At all times, plaintiff had a valid obligation to pay the defendant MARCH the said $3.4 million dollars by reason of the Property Settlement Agreement's provision for such payment in full and cash on or before May, 1968."

At the time March moved for leave to supplement the record, she also moved to dismiss the appeal and for an award of damages and costs pursuant to Rules 2, 10(e), and 38 of the Federal Rules of Appellate Procedure. In a brief filed in opposition to the motion to dismiss, counsel for Stolkin conceded that it was clear from the Fourth Amended Complaint that Stolkin did not make an agreement to forbear and references to such forbearance as consideration for the oral modification, although urged in the original brief and the reply brief of Stolkin, "must be stricken" from the briefs.

We have examined other contentions raised by Stolkin on this appeal and find them without merit.

Since we have fully considered all matters raised on this appeal and have arrived at the opinion that the referee correctly denied the petition for reconsideration, which was affirmed by the district court, we do not dismiss the appeal but affirm the judgment below.

■ While we find no discernible fault on the part of the present counsel of Stolkin on this appeal in presenting the matters furnished to him by his client in a lawyer-like manner, we are sufficiently persuaded that Stolkin caused the institution of a frivolous appeal and we therefore award double costs to the appellee March.

Affirmed.